The State ex rel. Covenant Mutual Benefit Ass'n of Illinois vs. Root.

---

THE STATE EX REL. COVENANT MUTUAL BENEFIT ASSOCIATION OF ILLINOIS vs. ROOT, Commissioner of Insurance.

*November 2, 1892 — January 10, 1893.*

*Life insurance: "Assessment plan:" Licensing foreign corporations.*

1. A mutual benefit association is *held* to be one providing insurance "upon the assessment plan," within the meaning of ch. 418, Laws of 1891, although it agrees to pay a definite sum and has fixed rates

83  667
89  179
83  667
93  559
83  667
98  221

83  667
f102 215
102  627
83  667
109  628
109  629
e109 630

83     667
s19 LRA  271
36 LRA 589n

The State ex rel. Covenant Mutual Benefit Ass'n of Illinois vs. Root.

of assessment which it is authorized to receive in advance, where it has no "legal reserve," but merely an "emergency fund," and its contracts expressly reserve to it the right to increase or lower the specified rates of assessment.

2. Upon complying with the conditions of ch. 418, Laws of 1891, a foreign insurance association is entitled to a license to do business in this state, and its admission or exclusion is not discretionary with the commissioner of insurance.

PETITION for a writ of *mandamus* to compel the commissioner of insurance to issue to the relator a license authorizing it to do business in this state, pursuant to ch. 418, Laws of 1891. The petition was filed May 18, 1892, upon leave granted, and an alternative writ was·issued. The defendant made return to the alternative writ, and the relator replied to such return; and thereupon the cause was sent to the circuit court for Dane county for the trial and determination of the issues of fact by said court without a jury. The findings of the circuit court, duly made and returned to this court, are in substance as follows:

1. The relator was duly incorporated in 1877 under a general law of the state of Illinois, entitled, "An act concerning corporations," and did business as an insurance company from that time until February, 1891. ·

3. In February, 1891, the relator amended its articles of incorporation so as to comply with and become incorporated under a general law of Illinois, adopted July 1, 1887, entitled, "An act to provide for the organization and management of corporations, associations, or societies for the purpose of furnishing life indemnity or pecuniary benefits to the beneficiaries of deceased members, or accident or permanent disability indemnity to members thereof."

4. In February, 1891, the relator adopted a constitution, by-laws, rules, and regulations. The constitution and by-laws provided, among other things, (art. II) that the object and business of the association should be to afford beneficial aid and assistance to the widows, orphans, heirs, or

devisees of deceased members, or to totally disabled members; that the membership should be composed of Odd Fellows, their wives and widows, and other persons; (art. V) that at the annual meeting of the association all Odd Fellows and the wives and widows of Odd Fellows who should thereafter be admitted or restored to membership should be entitled to one vote for each $1,000 indemnity held; (art. VI) that all moneys received by the association from whatever source should be placed in and belong to one of the following funds: the mortuary fund, the reserve-emergency fund, the advance fund, or the general fund; and all such funds should be used or invested under the direction of the managing directors, and held in trust for the benefit of the membership as provided in the rules and regulations.

The rules and regulations provided (in art. IV) that the secretary should keep separate accounts with the several funds of the association, and the interest arising therefrom, which interest should belong to and become a part of the respective funds from which it accrued; that any surplus not required in conducting the regular business of the association, belonging to any one or all of these funds, should be invested by the managing directors; that all moneys realized or received by the association from assessments or bi-monthly calls made and collected for mortuary, or total disability purposes should belong to and be placed in the *mortuary fund*, and no part or portion of this fund should be used in any manner or appropriated for any purpose other than the payment of death and total disability claims and the protection of the mortuary fund, except that the managing directors might set aside and transfer to the *reserve-emergency* fund twenty per cent. or less of the total amount collected from time to time for mortuary and total disability purposes, which amount, when so set aside and transferred, should be securely invested and held in trust

for the exclusive benefit of members of the association, to be used only for the following purposes, viz.: first, for the payment of death losses or total disability claims that might occur in any one year in excess of the rate stated in the actuaries' tables of mortality; second, to provide for and pay the actual increase of cost by reason of the advancing age of members; third, annually after January 1, 1897 (provided in the judgment of the management it could be safely done), to equitably distribute for use in paying mortuary premiums, any unappropriated surplus derived from the contributions made thereto during the sixth respective preceding year; fourth, on the death of a member who should have contributed to the reserve-emergency fund for six years, to return to his beneficiary the unused and unappropriated portion of such reserve-emergency fund which might have been contributed by said deceased member in his lifetime. That all moneys realized from fees, dues, expense premiums, or assessments, or received by the association from any other source, and not properly belonging to either the mortuary, reserve-emergency, or the advance fund, should be placed in a separate fund to be known as the *general fund;* and each member should pay twelve and one-half cents per month on each $500 insurance carried, which should be collected with each bi-monthly mortuary call; that all agency and general expenses should be paid from this fund; and when it should be in excess of the current mortuary requirements the managing directors might transfer such excess into the mortuary fund. That all moneys received by the association as advance premiums, or deposited with it to provide for the payment of future bi-monthly calls or assessments, should be placed in the *advance fund*, and used as prescribed, except, upon the death of the insured for whose benefit the advance deposit was made, any unused portion thereof should be withdrawn, and paid with the certificate at its maturity in addition thereto.

That the investment and management of all the funds belonging to the association should be under the direction of the board of managing directors.

The rules and regulations further provided (in art. V, sec. 2):

" An advance premium in accordance with the following table must be collected with each application for membership:

| On | $500 certificate | . . . | $7.00 | On | $2,500 certificate | . . . | $15.00 |
|----|------|------|------|----|------|------|------|
| On | 1,000 | " . . . | 9.00 | On | 5,000 | " . . . | 20.00 |
| On | 1,500 | " . . . | 11.00 | On | 7,500 | " . . . | 30.00 |
| On | 2,000 | " . . . | 13.00 | On | 10,000 | " . . . | 35.00 |

"The following shall be the annual cost upon each $1,000 indemnity carried:

| Age | Rate | Age | Rate | Age | Rate | Age | Rate |
|-----|------|-----|------|-----|------|-----|------|
| 21 | $10.68 | 31 | $12.21 | 41 | $15.19 | 51 | $24.60 |
| 22 | 10.77 | 32 | 12.40 | 42 | 15.76 | 52 | 26.04 |
| 23 | 10.87 | 33 | 12.60 | 43 | 16.44 | 53 | 27.67 |
| 24 | 10.96 | 34 | 12.88 | 44 | 17.20 | 54 | 29.30 |
| 25 | 11.06 | 35 | 13.08 | 45 | 17.97 | 55 | 31.22 |
| 26 | 11.25 | 36 | 13.27 | 46 | 18.93 | 56 | 33.33 |
| 27 | 11.44 | 37 | 13.56 | 47 | 19.89 | 57 | 35.54 |
| 28 | 11.64 | 38 | 13.84 | 48 | 20.95 | 58 | 38.04 |
| 29 | 11.83 | 39 | 14.23 | 49 | 22.00 | 59 | 40 82 |
| 30 | 12.02 | 40 | 14.61 | 50 | 23.25 | 60 | 43.80 |

"Indemnity for $500 may be carried for one half above rates.

"The above rates provide for the accumulation of the mortuary, reserve-emergency, and general fund."

5. In February, 1891, at the time of the amendment of its articles of incorporation, the relator adopted a new form of contract, a copy of which is in the record marked "Exhibit C." And as thus organized the corporation continued to do life insurance business, from February, 1891, down to the present time, in the state of Illinois and some twenty-six other states and territories, and in the Dominion of Canada; and in all said states and territories issued the same certificate or contract to all its members throughout all said states and territories, except that the contract or certificate issued to its members in the state of Ohio contained the following words, " provided the same be re-

alized by assessment upon the membership," which are not found in the contracts made or certificates issued by said company in the other states or territories, but in all other respects the Ohio contract was the same.

The contract, Exhibit C, which is in the form of a certificate, "witnesses that in consideration of the receipt of the regular membership fee, the payment of all bi-monthly premiums or assessments hereinafter required, and the representations, agreements, and warranties made in the application for membership of ——," the relator "does hereby issue this certificate and constitutes the above named applicant, hereinafter termed the insured, a member of the said association, and agrees to pay from its mortuary fund, and not otherwise, except as hereinafter provided, as a benefit to —— if living, if not, to the legal heirs and devisees of the insured, . . . the sum of —— dollars, together with such part of the emergency fund as shall be due under the terms of this contract, any unpaid premiums or other indebtedness being first deducted therefrom. . . .

"This certificate is issued and accepted subject to the following express conditions, requirements, and agreements:

"(1) To provide for the payment of all death claims or other current expenses, and to maintain an emergency or reserve fund to guaranty the prompt payment in full of all future obligations, there shall be due, according to the mortality experience and emergency fund requirements of the association, and payable at its general office in Galesburg, Illinois, on the first business day of January, March, May, July, September, and November, respectively, of each and every year during the continuance of this contract, a bi-monthly premium or assessment, based upon the annexed table of rates, and graded according to age and amount of benefits named herein; provided, however, that at such time or times as the insured shall be entitled to the advantages of the emergency fund, as hereinafter stated, the board of managers may readjust the grading or basis of the bi-monthly assessments or premiums due thereafter in accordance with the amount of such emergency fund then available, the current age of members, and the mortality experience of

the association; and provided further, that whenever the laws of any country, state, county, or municipality where the insured resides, shall require a special tax or license fee to be paid by this association, then the bi-monthly calls in each year may be so adjusted as to equitably cover such tax or license fee. If the bi-monthly premium, as above provided, is not received by the association within each of the calendar months designated above, whether notice is actually received by the insured or not, this contract shall terminate, and all rights and benefits hereunder be absolutely forfeited to the association. The insured may, however, pay annually or semi-annually in advance, in accordance with the rates given in the table of rates indorsed hereon for such payments.

"(2) The net amount received from bi-monthly premiums or calls, less the amount hereinafter provided for the general and emergency funds, shall constitute the mortuary fund, and shall only be used for the payment of death claims and the protection of the mortuary fund, except that the first mortuary premium paid under this certificate shall be charged with an equitable proportion of the medical examination fees actually paid by the association during the two preceding months. Twenty-five cents on each $500 of insurance, to be collected bi-monthly (which is included in the above-mentioned tables of rates), shall be carried to the general fund, to provide for agency and general expenses, and when said fund shall be in excess of the current and emergency requirements of the association, such excess shall be converted into the mortuary fund.

"To provide for the actual increase of cost by reason of the advancing age of members, and the payment of death losses in excess of the actuaries' mortality tables, twenty per cent. of the mortuary premium received under this certificate may be converted into the emergency fund, and held in trust, as provided in the by-laws, for the exclusive benefit of the members, to be used only for the purposes named above, except that after this certificate has been in force for six years from the 1st day of January following its date, and annually thereafter, there shall be an equitable distribution, for use in paying future mortuary premiums, of so much of the then unappropriated emergency fund and its accumulations as are derivable from the contributions made thereto during the sixth respective preceding year, and except, further, that upon the death of the insured after this certificate has been in continuous force six years from the 1st of January following its date, there shall be due to the beneficiaries hereunder, payable in like manner and under the same conditions as the benefits named herein, such part of the then total emergency fund and its interest accumulations as the association's actuary shall determine legally due in proportion to the contributions made by the insured thereto."

Vol. 83 — 43

The State ex rel. Covenant Mutual Benefit Ass'n of Illinois vs. Root.

Upon the back of said policy and as a part thereof is the following:

"TABLE OF RATES ON EACH $1,000.

"The following rates include the amount set aside for the reserve emergency fund and for total disability and expense purposes: [Here follows a table of the annual rates, being the same as that given above from art. V of the rules and regulations, and also including the rates when paid semi-annually and bi-monthly, and also a comparison with the annual cost of old line companies.]

"$500 indemnity may be secured at one half the above rates.

"These rates are based upon the actuaries' mortality tables, which are fully twenty per cent. higher than the average mortality cost experienced by the American life companies during the past thirty years. Any annual mortality in excess of the above rates for current ages, which may be loaded twenty per cent. for the reserve emergency fund, shall be paid from said fund without assessment."

6. After the adoption of ch. 418, Laws of 1891, and prior to May 11, 1891, the relator made due application for admission to this state to do business under said ch. 418, and for the purpose of complying with the provisions of said law filed with the commissioner of insurance an application for admission upon a form prescribed by him.

7. The commissioner of insurance thereupon investigated the character and standing of the relator and approved the same. He had not then prepared any form of license in writing or printing to conform to said ch. 418, but gave the relator parol authority to commence the business of insurance in this state, upon the assessment plan, under said ch. 418.

8. In pursuance of said parol authority, the relator did commence the business of insurance in Wisconsin under said ch. 418, and so continued to do business in this state until the issuing of the written license, on or about December 20, 1891.

9. On or about July 8, 1891, said insurance commissioner, by his deputy, notified the relator that complaint was being made to the insurance department that the relator was not

a strictly assessment company, for the reason, as claimed, that it levied a fixed amount or premium, and at the same time guarantied the payment of the full amount named in the certificate.

10. From July 8, 1891, and up to about December 22, 1891, a discussion was carried on between the officers of the relator and said insurance commissioner, or his deputy, as to the right of the relator to do business under said ch. 418; and on or about December 20, 1891, it was agreed between the agents of the relator and the said insurance commissioner that license should be issued to the relator to do business under said ch. 418 in Wisconsin, but it was mutually agreed that said license should expire on March 1, 1892. Said license was issued in pursuance of said agreement, and dated back to June 26, 1891; and the relator paid said insurance commissioner for said license the sum of $25.

11. On or before the 1st day of March, 1892, the relator did make and file with said insurance commissioner a report of its affairs and its operations during the year ending on the 31st day of December immediately preceding. Said report was made on the blank form approved of by said commissioner, and verified under oath by the duly authorized officers of the relator, and complied in all respects with all of the requirements of sec. 5 of said ch. 418.

12. On March 3, 1892, the relator received a letter from said insurance commissioner acknowledging the receipt of said annual report, and stating that the same had been examined and found satisfactory, and that the taxes and fees for filing the same were $10, and that on receipt of such amount the relator would be promptly licensed.

13. On the receipt of said letter from said insurance commissioner, the relator promptly forwarded $10, as requested, and license was thereupon issued by said insurance commissioner to the relator to do business in the state of Wisconsin, under ch. 418, but said license was limited in its opera-

tion to April 15, 1892. After the question was raised as to the particular fact whether or not the relator was doing an assessment business, the commissioner refused to give a written license until that question should be determined by the attorney general or the courts that they should be entitled to the same.

14, 15. Before the issuing of the license under date of March 1, 1892, it was mutually understood between the officers of the relator and said insurance commissioner and J. L. O'Connor, attorney general of the state, that an amicable suit should be commenced in the supreme court by filing a petition for a writ of *mandamus* to compel the commissioner to issue license to the relator to do business under said ch. 418, in order to have a construction put upon the chapter; and this suit was commenced accordingly.

16. The main objection raised by said attorney general and the insurance commissioner to the admission of the relator to do business under ch. 418 was that said contract marked " Exhibit C " agreed, as it was claimed, to pay a definite sum to the insured, and at the same time fixed an absolute rate of assessment upon its members, beyond which the company could not go; in short, that said contract was closed at both ends.

18. On or about March 13, 1892, and before the commencement of this proceeding, the relator, by a meeting of its board of directors, duly amended sec. 2 of art. V of its rules and regulations, so that the same should provide that " an advance premium of $8 per $1,000 insurance must be collected with each application for membership, and on applications for a less amount than $1,000 the advance premium shall be $8. . . . The assessment rates of the association shall be based upon the following tables for each $1,000 indemnity, and shall be such percentage thereof as the mortality experience of the association shall require: [Here follows a table of the rates for ages from twenty-

one to sixty years, the same as that given above under the fourth finding.]"

19. At the same meeting of said board of directors the relator also adopted a new form of certificate or contract.

20. Said action of the directors was taken in part for the purpose of removing the objection raised by said insurance commissioner and attorney general to the admission of the relator under said ch. 418, namely, that its contract or certificate, as claimed, did not permit it to levy an assessment beyond the amount named in the table therein.

21. On or about May 14, 1892, a copy of said new form of contract, and of the constitution, by-laws, rules, and regulations, as amended at said meeting of said board of directors, were filed with the commissioner of insurance, and a demand made that said commissioner of insurance issue a license to the relator to do business under said ch. 418.

22. From March 13, 1892, up to the present time, the relator has issued the form of contract adopted by it at that time, in all the states and territories in which it has done business, except in the state of Ohio, where said contract was modified by the incorporation of the language above found.

23. From the date of the organization of the relator in 1887, up to the amendment of its articles in February, 1891, the rates assessed against its members varied from time to time as the needs of the company required, but for several years at a time during said period said rates remained the same.

24. From February, 1891, up to the present time, under the present plan of the company, the rates of assessment upon the members have been the same and have been collected six times a year at the times named in the contract.

25. "The court finds that the relator does not have what is known as a 'legal reserve,' but keeps on hand what is called an 'emergency fund' merely, and agrees to pay a

definite sum to the person insured, and collects from its members at regularly stated intervals, a certain number of times per year, an amount named in the contract or certificate of membership, and reserves the right in its contract to increase or lower the rates of assessment specified in said contract as the basis of assessment, according as the needs of the corporation may demand or permit."

26. Since February, 1891, and for many years prior thereto it has been the practice of the relator to pay to the beneficiaries of a deceased member the amount due under the policy immediately or as soon as practicable after the death of the member, in the main out of funds which said corporation had on hand as a surplus fund, and thereafter, and at stated intervals, to collect from its members by assessment the amount necessary to pay such death claims. The method of making these assessments or bi-montly calls since February, 1891, is contained in the circular which accompanied each notice of assessment.

27. The meaning of the term "current age," as used in insurance contracts and insurance literature, refers to the age of the members insured as they rise from year to year in age, and not to the age of the member at the time of entry.

29. The relator advertises extensively that it does business on a plan which admits of easy payments and of definite amounts; that it does business on a different system from that followed by other insurance companies; that its system of doing business is as regular as the level premium system; that its system is an improvement upon any other, avoiding the defects of a purely co-operative system and the useless requirements and unnecessarily high cost of a level premium system, and that it occupies a middle ground, offering much greater security than the former, at half the rates charged by the latter; that it retains all the security, safeguards, and definiteness of contract of the best level

premium companies, and reduces the cost to less than half the usual rates, and that the maximum cost to its members for each $1,000 of insurance, according to age, has been fixed, and is shown in the printed tables. It advertises that its premiums are fixed, and that the contract shows the exact amount and time of payment, and that the average premium paid by the members have been less than one third of the amount charged by the old line companies; that the corporation is able to carry the insurance upon a level premium basis with less than half the cost of the old line company, upon equally as solvent and permanent a plan; and that there is a maximum limit to the amount which can be collected annually from each member. It also advertises extensively in journals and newspapers that its policies agree to pay a definite amount at fixed premium rates.

The findings of the trial court appear to be sustained by the evidence.

For the relator there was a brief by *W. C. Calkins* and *Olin & Butler*, and oral argument by *J. M. Olin*.

. For the defendant there was a brief by *H. W. Chynoweth*, and oral argument by *Mr. B. W. Jones* and *Mr. Chynoweth*.

CASSODAY, J. The relator claims to be a beneficiary association furnishing life insurance upon the assessment plan, organized under the laws of another state, within the meaning of ch. 418, Laws of 1891, and that as such it is entitled to a license to do business within this state, upon complying with the conditions of that chapter. The defendant, as commissioner of insurance, being in doubt as to the true construction of the chapter, at first hesitated as to whether such license should be issued, and finally, after considering the matter for some time, and on June 26, 1891, he gave or assumed to give to the relator temporary parol permission to engage in such business until further

notice. From July 8, 1891, to December 22, 1891, a discussion was carried on between the relator and the defendant, which finally terminated in the issuing of a license to the relator; dated back to June 26, 1891, and which, by its terms, would expire March 1, 1892; and for which the relator paid the sum of $25. Prior to the expiration of that license, the relator filed with the defendant its annual statement, as required by the act. March 3, 1892, the defendant, in a letter sent to the relator, acknowledged the receipt of the statement so sent, and stated, in effect, that the same had been "fully examined and found satisfactory;" that "the taxes and fees are as follows: Filing annual report, $10. On receipt of this amount, your company will be promptly licensed." The sum so named was then paid by the relator, and thereupon a second license was issued by the defendant to the relator, dated back to March 1, 1892, but limited to expire April 15, 1892. Before the issuing of that license it was mutually understood between the relator and the defendant and attorney general that an amicable suit should be commenced in this court, in order to secure a construction of said ch. 418, Laws of 1891, and this suit was commenced accordingly.

It is to be regretted that the language of the act is not sufficiently explicit to preclude doubt on the part of the administrative officers of the state. Undoubtedly the legislature has the authority to prescribe such conditions and restrictions upon foreign insurance companies doing business in this state as it may see fit to impose. *State v. United States Mut. Acc. Asso.* 67 Wis. 629; *Stanhilber v. Mutual Mill Ins. Co.* 76 Wis. 291, and cases there cited. As indicated in these cases, such "legislation does not pertain to matters of interstate commerce, nor the privileges or immunities of citizens in the several states," but is a matter of state policy, resting entirely in the discretion of the legislature. We are only called upon, therefore, to

ascertain, if possible, the intention of the legislature as expressed in the act in question; and, of course, whatever may be the result, it is subject to immediate change or modification by that body, which is about to assemble.

The general laws in respect to life insurance corporations, as contained in the Revised Statutes of 1878, are found in secs. 1947–1955, and which corporations will, for convenience, be herein designated as "regular life companies." By ch. 204, Laws of 1879, "the secret, beneficiary, charitable, and benevolent orders" therein specifically named, being thirty-six in number, are thereby "declared not to be life insurance companies in the sense and meaning of the general laws of this state relating to life insurance and life insurance companies, and such societies, orders, and associations are, and shall hereafter be, exempt from the provisions of said general laws;" and such orders are, for convenience, herein designated as "exempt life associations." Those provisions respecting such exempt life associations remained substantially the same down to 1889, except that other similar orders were from time to time, by amendments of the act, added thereto, until the number so specifically named exceeded seventy, as will appear by the citations in 1 S. & B. Ann. Stats. sec. 1953*b;* and since that time another has been added by ch. 441, Laws of 1891. By ch. 334, Laws of 1889, all so-called "fraternal assessment insurance corporations" doing business in this state, and included in those designated above as "exempt life associations," were thereby required to report to and be under the jurisdiction of the insurance commissioner, as therein prescribed; otherwise to be excluded from doing business in the state, and their officers and agents subjected to punishment. 1 S. & B. Ann. Stats. secs. 1955*a*, 1955*b*. By sec. 4, ch. 418, Laws of 1891, all beneficiary corporations, societies, orders, or associations *theretofore* organized or incorporated in this state, or admitted to do business therein

under the provisions of said act, and all such " exempt life associations," are thereby " declared to be *mutual benefit associations*, and exempt from the provisions of the general insurance laws of this state," and thereby made subject only to the provisions of said act; and by sec. 5 of the act every such " mutual benefit corporation, society, order, or association," as thus defined in sec. 4, is required to report to the insurance commissioner as therein prescribed. Thus it appears that all such *specifically named* " exempt life associations " were required by law to report to and be under the jurisdiction of the insurance commissioner.

' Ch. 418, Laws of 1891, was published and went into effect May 9, 1891, and is entitled " An act to regulate mutual, beneficiary and fraternal corporations, societies, orders, and associations *providing insurance on the assessment plan*." Prior to that enactment there does not appear to have been any general law in this state for the organization of such fraternal or beneficiary corporations, societies, orders, or associations furnishing life or casualty insurance or indemnity upon the mutual or assessment plan, nor for the licensing of foreign associations of the character indicated, to do business in this state. Sec. 1 of the act prescribes the manner in which such corporations, societies, orders, or associations might *thereafter* be organized or incorporated in this state; and provides that whenever one is so organized and " approved by the commissioner of insurance, he shall issue a certificate authorizing " the same " to engage in the business of insurance *on the assessment plan set forth* in said articles of incorporation or constitution and by-laws," and the same thereafter is lawfully entitled to transact business in accordance with said act. Sec. 2 of the act provides, in effect, that " no fraternal or beneficiary corporation, society, order, or association furnishing life or casualty insurance or indemnity upon the mutual *or assessment plan*, organized under the laws of any other state,  .  .  .

nor any voluntary fraternal or beneficiary corporation, so-
ciety, order, or association having its principal place of
business outside of the state of Wisconsin, and not " then
included in such " exempt life associations," " shall transact
business in this state, until it has- filed with the commis-
sioner of insurance  .  .  .  of this state an *application*
for admission, upon a form prescribed by the commissioner
of insurance, setting forth " the several things therein men-
tioned.   Such application appears to have been duly made
and filed by the relator prior to May 11, 1891, as found by
the trial court in its sixth finding, mentioned in the fore-
going statement.   The proviso in that section is merely for
the purpose of relieving the applicant from certain condi-
tions here present, and need not, therefore, be considered.
Sec. 3 of the act provides, in effect, that upon such applica-
tion being so made the insurance commissioner shall in-
vestigate the character and standing of such applicant, and,
if the same is approved by him, and such conditions have
been complied with, he shall notify such applicant of his
approval; whereupon such applicant shall appoint in writ-
ing such insurance commissioner to be its attorney, upon
whom all legal processes may be served; and, such " condi-
tions having been complied with, the commissioner of in-
surance *shall issue to such*" applicant " a license, after
which it shall have authority to transact business in this
state; and said license shall continue in force until revoked
in accordance with the provisions of this act."   As found
and indicated above, such investigation was had, and such
appointment and approval were made.

The final refusal to continue such license appears to have
been based, as found by the court, principally upon the al-
leged agreement by the relator in Exhibit C to pay the
assured a definite sum, and at the same time fixed an abso-
lute rate of assessment upon its members beyond which
the company could not go.  But this seems to be fully an-

swered by another clause of the findings, to the effect that the relator does not have what is known as a " legal reserve," but merely an " emergency fund;" and "reserves the right in its contract to increase or lower the rates of assessment specified in said contract as the basis of assessment, according as the needs of the corporation may demand or permit." Among the conditions required by sec. 2 of the act, and contained in this application, is that the relator " has accumulated a fund equal in amount to one assessment upon all its members, and that said accumulation is permitted by the laws of the corporation, and that said funds are safely invested as provided by the laws of the state where organized, and can only be used as provided by the laws of such state." Such accumulation is expressly authorized by sec. 11, ch. 418, Laws of 1891, which appears to have been copied from the Illinois law under which it was secured to the relator. Besides, as found by the court, to remove the objection of the defendant to such admission of the relator, the latter did, March 13, 1892, lawfully amend its rules and regulations, and modified its form of certificate and contract, so as to expressly authorize it to levy an assessment beyond the amount named in its table; and thereupon the relator's constitution, by-laws, rules, and regulations, as amended, and such new form of contract, were filed with the defendant, and a demand made upon him to issue such license; and since that time the relator has used such new form of contract.

It seems to us that the relator is a beneficiary association furnishing life insurance upon the assessment plan, within the meaning of the act in question. The mere fact that the relator was authorized to receive calls or premiums in advance does not destroy its character as such insurance association. It sufficiently appears that at the time of the application the laws of Illinois did not prevent the admission of fraternal or beneficiary corporations, societies, or-

ders, or associations, organized under the laws of this state, except as under the same or similar restrictions as provided in the act in question.

It is contended that the admission or exclusion of such foreign association is wholly discretionary with the insurance commissioner.   It is true the law requires him to investigate the character and standing of such applicant; but when, as here, he finds, upon such investigation, that the conditions named in sec. 2 of the act have been complied with, then he is thereby required to notify such association and issue a license to the same.   In other words, the law regulates the conditions upon which such foreign association may do business in this state, and upon complying with the conditions they have a right to the license.   The relator may, at its option, take the license as. of April 15, 1892.

*By the Court.*—A peremptory writ of *mandamus* is hereby directed to be issued in accordance with the prayer of the relator's petition.

See note to this case in 19 L. R. A. 271. — REP.