### HAYDEL v. MUTUAL RESERVE FUND LIFE ASS'N.

(Circuit Court, E. D. Missouri, E. D. October 17, 1899.)

1. LIFE INSURANCE—ASSESSMENT POLICY—WHAT CONSTITUTES.

A life insurance policy in which the premiums to be paid by the insured are not fixed and unalterable, but may be increased, in the discretion of the officers of the company, or to meet increased demands for payment of losses, is, in legal effect, an assessment policy, and is not ultra vires the powers of a company authorized by its charter, and by the statutes under which it is organized, to do business as an assessment company only.

2. SAME—ASSESSMENT COMPANIES—FAILURE TO PAY ASSESSMENTS.

A policy holder in an assessment company is not excused for a failure to pay assessments on the ground alone that the company has engaged in business which is ultra vires its powers, but he must further show that his obligations have thereby been changed to his disadvantage.

3. SAME—POWER OF COMPANY TO INCREASE ASSESSMENTS.

The fact that an assessment company prints on the back of its policies a table, which purports to show the amounts to which one becoming a policy holder at a given age will be subjected, does not prevent the company from increasing such rates, where the policy is expressly subject to the constitution and by-laws of the company, which give its executive committee power to make modifications in the assessments to be levied from time to time.

4. SAME—DEFENSES AGAINST INCREASED ASSESSMENTS.

A provision of a policy in an assessment company that a certain per cent. of the net receipts from assessments shall constitute a reserve fund,

and that such reserve fund above $100,000 and in excess of outstanding bond obligations shall be applied to the payment of claims in excess of the American Experience Table of Mortality, cannot avail the policy holder as a defense against increased assessments upon a mere allegation that the reserve fund has for a number of years been greatly in excess of $100,000, and that the company has failed to apply it in accordance with the contract, where it is not alleged that the death claims against the company have been in excess of the American Experience Table, and where the policy is further made subject to the constitution of the company. which authorizes the board of directors to divert such reserve fund to other uses.

5. SAME.

A provision of a policy in an assessment company that, after the expiration of each period of five years, the rate of assessment may be changed to correspond with the actual mortality experience, does not prevent the company from increasing the rate at other times, where such increase is authorized by other provisions and by its constitution.

6. SAME—FAILURE TO PAY ASSESSMENT—WAIVER OF PROMPT PAYMENT.

The holder of a policy of life insurance in an assessment company died three days after the expiration of the time for payment of an assessment, not having paid such assessment. During the life of the policy some seventy assessments had been made, all of which, with the exception of seven, had been paid within the time limited therefor. Six of the seven were paid on the next day, and one on the second day after the expiration of such time. In three or four of these instances receipts were given conditioned on the insured then being in good physical condition, and stating that the acceptance of the payment should not be regarded as a waiver of prompt payment of future assessments. Others of such payments were made on Monday where the last day allowed for payment fell on Sunday, and the last default was some four years prior to the death of the insured. It was also shown on the part of the company, by uncontradicted testimony, that the insured knew when the time for payment expired, and that on the day before his death he stated to an agent and an officer of the company his dissatisfaction with the insurance, and doubt whether he would make the payment, and ask reinstatement. *Held*, that such evidence was insufficient, as a matter of law, to establish a course of dealing which would sustain a claim of waiver of prompt payment on the part of the company.

This was an action on life insurance policies, tried before a jury. On motion by defendant for direction of a verdict.

E. T. Farish, for plaintiff.

W. C. & J. C. Jones, George Burnham, Jr., and Sewell T. Tyng, for defendant.

ADAMS, District Judge (orally). The case stands on a petition charging that the defendant, a mutual life insurance company, executed two policies of life insurance on the assessment plan; that the insured, plaintiff's husband, paid all dues and assessments required of him, and otherwise conformed to the conditions of the policies; that insured died March 6, 1898; and that, therefore, plaintiff is entitled to recover. The answer of the defendant is, in substance and effect, as stated in the petition, that it is a corporation doing business on the assessment plan; that under the terms of the policies (and the constitution and by-laws, which are referred to in, and made part of, the contract of insurance) the insured was required to pay assessments as and when they were made and called by the executive committee or board of directors of defendant company; that an assessment was made, known as "Mortuary Call No. 96," in Feb-

ruary, 1898, calling for a certain amount on each of these two policies; that this assessment was due, according to the terms and provisions of the policies, within 30 days thereafter, to wit, on the 3d day of March; that the insured failed to pay that assessment, and therefore, under the stipulations in the policies, constitution, and by-laws, the plaintiff's rights under these policies ceased, notwithstanding the death of the insured, which occurred March 6, 1898, a few days after the last date allowed to pay the assessment. In brief, the defense in the case is forfeiture for failure to pay assessments.

The replication, after alleging that the assessments (No. 96) were largely increased over what they had formerly been, admits that the assessments were not paid on either of the policies, and presents several separate grounds by way of excuse for the nonpayment of said assessments. The first excuse pleaded in the replication is that the defendant company was a corporation doing business on the assessment plan, and was authorized and empowered by the laws of New York to do business only on that plan; yet, notwithstanding such limitation upon its powers under its charter and the laws of the state of New York, it proceeded, after it had insured the member in this case, to devise a scheme of general insurance on practically what is known as the "old-line" plan of insurance, of certain and fixed premiums for fixed and certain liabilities. It is charged that this character of insurance was ultra vires the corporation, and, being so ultra vires, entailed upon the members of this, an assessment or mutual company, new and different obligations, which were not contracted for by the parties, or contemplated by the laws of the state of New York; and it is specifically alleged that the issuing of this kind of insurance contracts was not only ultra vires the corporation, but thereby money which belonged to the mortuary fund under the original or assessment scheme of insurance was diverted,—that is, that a large amount of money was thus diverted, and used in a business which was ultra vires the corporation, or not within the power of the corporation,—and that, if this money had not been so diverted, there would have been plenty of money to have paid the liabilities matured on the 3d day of March, 1898, and the call for assessment No. 96 would have been unnecessary.

It will be seen from this statement of the first excuse for nonpayment of these assessments that the party pleading realized the legal situation, and understood that, notwithstanding the fact that the particular class of business which he complains of was beyond the power of the corporation, and ultra vires, that fact in itself would be no defense to this action. In other words, he appreciated that the plaintiff in this case could not state, as a full legal excuse for nonpayment of the assessments, the single fact that this defendant had been doing business beyond its corporate powers in some other transactions, and he therefore averred in his reply that, not only was the transaction of this business ultra vires, but that thereby money which, according to the contract, and laws of the state of New York, belonged to what was originally the assessment class, was diverted for the benefit of the so-called "old-line" class, so that it was lost,

and therefore it was the fault of the company, and not the fault of the member, if this assessment was not paid.

There are two questions involved in considering this first excuse for nonpayment of the assessment: First, whether the character of the business known as the "five-year combination option policy" is unwarranted, and beyond the powers of the corporation under the New York statutes. I have given this question all the attention which I have been able to give it during the progress of the trial, have examined the statutes of the state of New York, and especially this contract called the "five-year option policy." In determining whether it is ultra vires, it is important to understand distinctly what is assessment insurance, or insurance on the assessment plan; and a general statement of this proposition is that it is assessment insurance where the benefit to be paid is dependent upon the collection of such assessments as may be necessary for paying the amounts insured. In other words, it is assessment insurance if payments to be made by the insured are not fixed—unalterably fixed—by the contract. On the contrary, an old-line policy is a contract where the amount to be paid by the insured is fixed, the premiums to be paid are unalterable, and the liability incurred by the defendant company is also fixed, definite, and unchangeable. In the light of this distinction,—which no one will dispute,—it becomes important to see whether the five-year combination option policy, which is the form of policy complained of, is a policy that has fixed and unalterable premiums becoming due at certain definite and fixed times, and none other. In determining this it is proper to call attention to two particular phases of it. It is true that the contract, on its face, requires the payment of so many dollars and cents at certain specified dates in each and every year during the continuance of the contract. The contract is made subject, however, to this provision on the back of the policy (clause 5), in which it is provided as follows: "On the dates named on the first page hereof in each year during the continuance of this policy there shall be due from the assured for premiums the amounts mentioned on said first page, or such multiple or ratio thereof as its executive committee may determine;" thereby clearly indicating that it is left to the executive board to determine how much shall be required of the member to pay the losses as they may accrue from time to time in the transaction of the business of the company. In addition to this, a reserve or emergency fund is provided for by this policy, and a particular and definite way is indicated for the distribution of this reserve. The reserve belongs, of course, to the members, and the distribution thereof must vary from year to year and always, as a matter of course, according to the death losses and claims paid during such year. So that, from article 5 and the provisions of this policy as to the treatment of the reserve, it is apparent that this is not a policy of fixed premiums or liabilities on the part of the insured, within the meaning of the general rule which obtains with regard to an old-line policy, but is an assessment policy, within the meaning of that rule and under the laws of the state of New York concerning assessment life insurance; and, in the opinion of the court,

the entering upon this kind of business was not ultra vires the corporate powers.

In the next place, as I have heretofore remarked, proof that the acts of the association were ultra vires is in itself insufficient. Plaintiff must further show that thereby insured's obligations were in some wise changed to his disadvantage. There is no proof that the defendant permitted the money that belonged to the mortuary fund of the association to be diverted or appropriated for the benefit of the five-year combination option policies, or that the mortuary fund applicable to payment of death losses on the 15-year assessment policies was reduced thereby. In my opinion, there is a failure to prove that the 5-year combination policy was unauthorized, or that the insured or plaintiff was affected thereby disadvantageously. For both these reasons the first ground alleged as an excuse for the nonpayment of the assessment is invalid.

The second excuse alleged is that, according to the stipulations of the contract, the amount of the insured's assessments was unalterably fixed for his entire life at $3.50 per $1,000 of insurance, and that, Dr. Haydel being then 56 years of age, his assessments were limited to $35 upon each $10,000 of insurance on his life. There is provided, by the table on the back of the policy, some such proposition as this, but in many other places in the policy, and in defendant's by-laws and the constitution,—which, I take it, govern this case,—there is a special power conferred upon the board of directors and upon the executive committee of the company to make such changes in the amount of assessment as from time to time may be required; and, as a matter of course, insurance on the mutual plan being different from insurance on the old-line plan, the members of the company are, so to speak, partners; they are each and all interested; and it is necessary, in carrying on this kind of business, that the association should, from time to time, collect by assessments for all deaths as they occur such amount as may be necessary; and ample provision is found in the policy and provisions of the constitution for this purpose. To each one of these provisions I need not call particular attention, but one particularly I will allude to, which gives the executive committee power to make any modifications that are necessary in the way of determining and fixing a just and equitable amount of the premiums or assessments to be levied from time to time when losses occur, and to meet these losses. I refer to section 8 of article 11, which provides that the board of directors shall have authority to fix and determine the amount of assessments for which the members shall be liable, and the rates of assessment, the amount of annual dues, and to adopt such other rules and regulations as they may deem best for the interests of the association. It is to be noted that their powers under this provision are very broad. The policy itself and the table on the back thereof are made subject to the constitution, subject to the by-laws, and subject to any amendments that may be from time to time adopted; and one becoming a member of the mutual insurance company takes his membership subject to the provisions of the constitution and the by-laws, and subject to such changes

as may be made pursuant thereto in the rates and assessments; so that the fact in itself that the insured had a policy with a table on the back fixing the rate of assessment is no excuse for the lapse in this case.

The next excuse is that by provision No. 2 of the policy it was agreed that 25 per cent. of the net receipts from the assessments should constitute a reserve fund for the exclusive benefit of the members of the association. Said reserve above $100,000 (and in excess of the amount represented by outstanding bond obligations) should be applied to the payment of claims in excess of the American Experience Table of Mortality, and, when any claim by death was due, to make up any deficiency in the death fund. It is alleged in this replication, as a further excuse for the nonpayment of these assessments, that the reserve fund authorized to be raised and maintained, according to the provisions I have just alluded to, for a long period of time, to wit, for 12 years prior to the 1st day of February, 1898, amounted to some $3,000,000; and that the same, under the provision aforesaid, should have been applied to payment of claims in excess of the American Experience Table of Mortality, or to making up the deficiency in the death fund. The plaintiff avers that, instead of using and applying the reserve fund to making up any deficiency that might have existed in the death fund, the defendant wholly ignored its said contract when it made the assessment in question. It is to be noted, in considering this excuse, that the plaintiff entirely fails to aver that the reserve fund exceeded its bond obligations, or that the mortality experience of the defendant association was in excess of the American Experience Table of Mortality. In other words, in the allegation that there was this large amount of reserve fund the pleader utterly fails to observe that this particular fund could not have been devoted to the payment of death claims unless such claims were in excess of the American Experience Table of Mortality. Entirely apart from this, however, it appears from the different provisions of the constitution and by-laws, and in the subsequent amendments of the constitution, and by the subsequent development of the schemes of business of this company, that the board of directors had the power to devote its reserve fund in any manner they saw fit, provided it be made subject to the general purposes of the corporation and to the business being carried on for the benefit of the members. This clearly appears from the particular amendment to which I have called attention, by which the board of directors and the executive committee are fully empowered to determine each year the disposition that shall be made of the reserve fund; and the fact that they failed to apply the reserve fund or failed to devote this fund to the payment of claims in excess of the American Experience Table of Mortality, would not, in itself, be an excuse for the nonpayment of assessments.

The next excuse is that the defendant diverted the mortuary fund from its proper channel, and used it for the payment of expenses. I do not find, in any statement of any witness, anything to support this charge.

For the next ground of excuse the plaintiff avers that by clause No. 3 in the policy it was provided that, after the expiration of each period of five years, the rate of assessment might be changed to correspond with the actual mortality experience, and that thereby the defendant was limited to this quinquennial period for making changes in the assessments or mortuary calls, and that, whenever any changes in assessments were made at any other than that five-year period, they were null and void. This contention, however, overlooks the fundamental principle of the corporation's business, which, in its very nature, requires that it should collect from its members sufficient to meet the demands that should be made upon it for the payment of death losses, and disregards the provisions for making assessments for that purpose,—not only those in the by-laws, but those contained in this policy also. The various provisions of the policy and the various provisions of the constitution and by-laws and amendments thereto must, of necessity, enter into the construction of this contract; and one of the provisions of both the policy and the constitution is that the company may at any time, when demands for the payment of death losses require it, make assessments upon the members for such amount as shall be necessary to meet the demands therefor.

The next ground of excuse is that, by a course of dealing between the defendant company and the insured in this case, the prompt payment of this assessment was waived. The plaintiff claims that the defendant company had frequently permitted the insured to pay the assessments at a later time than that which was fixed by the calls and provided for and contemplated in the policy itself, and that thereby the insured was led to believe that he could pay call 96 at a later day than March 3, 1898, and, relying on this belief, he deferred payment until a day later than March 3d. The proof is that from 1884 to 1898 some 70-odd assessments were made, and that as to all of these there was no failure by the insured in manner or time of the payment of them, with the exception of 7 only. That is the extent of the claim, and all that could be claimed, under the proof. Now, as to these seven particular instances in which the time for the payment of the assessment was deferred, in each instance the delay was for one day only, though, I believe, on one occasion—one particular instance—there was two days' delay. In two of the instances it appears that the reason for the delay was because the last day for payment, according to the calendar, was Sunday, and payments were made promptly on Monday. As to three or four of them it appears that at the time the payments were made a receipt was given by the company, in which it declared that it received the assessment on condition that the insured was then in good health, and in insurable condition physically, and with the distinct proviso that the receipt of this assessment after it was due should not be regarded as a precedent for releasing the insured from thereafter paying promptly, nor considered a waiver of prompt payment of future assessments. Under this plea the plaintiff must show that by a course of dealing between the company and the insured the insurance company caused the insured to believe that it

did not intend thereafter to exact prompt payments of premiums, and that the insured, relying upon that course of dealing, had tendered payment after the time limited by the contract, and as and when he was permitted to pay by this concession of the company. Now, understanding that waiver is largely a question of intent, did the parties intend, at the time of making and receiving these payments a day or two later, and mean to say to each other, that that provision of the contract was waived, and thereafter that the insured was entitled to a length of time over and above that provided by the policy? There is one payment, and only one, that is not fully explained. This payment was made one day after it matured,—which was in 1894; and it was made after two or three of these conditional receipts had been given, in which the insured had been informed that the postponement of the payment of the premium should not be made a precedent, and that it should not be considered a waiver of the payment by the company. I am not prepared to say that delay in one payment, and that delay for one day only, is sufficient to establish the waiver, especially as after that time (1894) there was no omission to make prompt payment of assessments,—that is, from 1894 to 1897 the assessments were promptly paid; and, in my opinion, that single instance in itself, so far back, is insufficient to entitle plaintiff to go to the jury on the question of waiver. It is simply one instance, throughout a course of conduct running all through the life of this policy, where payment was not strictly made within the time required, except when a distinct contract was entered into by the parties to the effect that the policy had been lapsed, and that if the insured was then in good health and insurable, and provided this should not be construed into a precedent, the company would continue his insurance. So far I have treated this question solely on the evidence of the plaintiff, but, as the case now stands, if it goes to the jury, it will go to them with this other evidence, which has been introduced by the defendant, and which is entirely uncontradicted, namely: That prior to March 3, 1898 (the last day for payment of call 96), the insured had informed some of the officers of the company that he did not know that he should keep up his policy. That on the 5th of March, not having appeared to pay his premium or assessment, although it is conceded he had due notice thereof, and although it is conceded by the bookkeeper that he in fact had actual knowledge that it was due on the 3d day of March, the insured was brought into the office of the defendant company, and had a talk with both the agent and the treasurer of the company. He told them that he had let his policy lapse, and that he was very much in doubt (even after the importunate demands of the agents) whether he had better continue this insurance; and he was told by them at the time that, if he desired any reinstatement, he must proceed in accordance with the terms of the policy, and make application therefor. He said the premiums were too high for him, and that he could probably get insurance cheaper than to reinstate his policy. On being importuned still more by the agents (in their usual diligent manner, no doubt) to go on, and make this payment, and secure the benefits of this

insurance, he replied that his present impressions were that he would not do it. He realized and knew he had not paid the premiums. He realized the obligations of the contract, and the fact of the nonpayment of this assessment, but he said: "I will postpone it for a few days. I want to think this matter over. I don't like this insurance. I believe I can get better." This conversation was on Saturday, and he died on Sunday morning. At the time this effort was being made to induce him to pay his premium (which seemed to be an honest and very anxious one on the part of the agents); and when his attention was called to the uncertainty of life, he boasted that life was not uncertain with him, that he had twenty years of expectancy, and that he belonged to a race of great longevity. Instead of that, it appears he died very suddenly on the following day.

In the light of these facts it would simply be farcical, it seems to me, to submit to the conjecture or caprice of any set of men the possibility of there being an intent on the part of the company to waive the payment of this assessment, and whether that intent was relied upon by the insured and acted upon by him, and by reason thereof that he did not pay promptly. I do not think there is any evidence on which to submit the case, and I shall tell the jury there can be no recovery.

Judgment for defendant accordingly.