EARL E. KENNEDY ET AL., APPELLANTS, V. ROYAL HIGH-
LANDERS ET AL., APPELLANTS: ANDREW GROSSHANS
ET AL., APPELLEES.

FILED JULY 19, 1922. No. 22346.

1. **Insurance:** MUTUAL BENEFIT ASSOCIATIONS: AMENDMENTS OF BY-
LAWS. A mutual benefit association may amend its by-laws to in-
crease the amount of assessments or make reasonable amend-
ments, affecting the organization, government and internal work-
ings of the order, but it has no power to cancel the obligations of
its contract, or to reduce the benefits payable thereunder, though
the member has agreed to be bound by the laws of the society as
they stood when he entered, or as they might thereafter be
amended.

2. ———: ———: POWERS: Where a statute provides for the or-
ganization of mutual benefit associations under it, a recognition
by the legislature of particular powers as existing in such asso-
ciation may be construed as a grant of those powers to the associ-
ation which organized under the act.

3. ———: STATUTES: CONSTRUCTION. Section 1 of the laws of 1895
relating to mutual benefit associations (Laws 1895, ch. 42) men-
tions as among the powers of such associations the power to write
endowments, but by section 16 following it is provided that no
association, operating upon the assessment plan, shall be per-
mitted to do business in this state which promises any indemnity
upon any other event than that of the death or disability of the
member. The two provisions being directly contradictory to each
other, as applied to companies operating upon the assessment plan,
*held* to raise such confusion and ambiguity that the contempora-
neous construction, given to the statute by the officers charged with
the authority to enforce it, and by the society, for a long number
of years, would be looked to as bearing great weight upon the
question as to what interpretation should be given by the court.

4. **Statutes:** CONSTRUCTION. The construction placed upon a statute
by the officers charged with the enforcement thereof in the dis-
charge of their duties at or near the time of its enactment, and
which construction has been acquiesced in and recognized by those
governed by the statute for a long period of years, will be fol-
lowed by the courts, unless such construction can be said, from
the terms of the statute, to be erroneous and a construction which
could not have been reasonably given to it.

5.  Insurance: "ASSESSMENT PLAN." An association, organized under the act, which issued benefit certificates and provided for payment by its members of a *per capita* tax of not over $1 a year and for regular monthly payments of a given amount, determined by the age of the member at the time of his making application for insurance, such rates being fixed by the by-laws and subject to change by the society at any time it found necessary in order to meet the needs of the society, and which association had no plan to create a legal reserve, but only to collect such amounts as to provide an emergency fund to meet current losses, *held* to be a society operating upon the "assessment plan," within the meaning of the term as used in the statute.

APPEAL from the district court for Hamilton county: EDWARD E. GOOD, JUDGE. *Affirmed.*

*E. J. Hainer, Miles M. Dawson* and *O. B. Clark,* for appellants.

*Thomas, Vail & Stoner, contra.*

Heard before MORRISSEY, C. J., ROSE, DEAN, ALDRICH, DAY and FLANSBURG, JJ.

FLANSBURG, J.

This was a proceeding brought by certain members of the Royal Highlanders, a fraternal beneficiary association, against the association and other members who were holders of what were called "pioneer certificates." These certificates contained a provision for the payment of endowments. The object of the suit was to enjoin the society from paying such endowments on the ground that the provisions were unenforceable. The trial court denied the relief, held the endowment provision good and dismissed the proceeding. An appeal is taken from that order.

Prior to the year 1887 there were no laws particularly applying to mutual benefit associations, such associations being incorporated under the general insurance statutes. In 1887 a statute was enacted (Laws 1887, ch. 18) providing that secret societies and associations, where the management and control was confined to the membership of the society, and which, in addition to benevolent and fraternal features, issued certificates of indemnity, calling

for payment of certain sums in case of death, disability or sickness of its members, should be exempt from the general insurance laws, but should be subject to other specific regulation. In 1895 a further statute of like import was enacted. Laws 1895, ch. 42. It provided for the organization of such societies not incorporated, and required all mutual benefit associations to submit their articles to the auditor of state and attorney general for their approval. Each corporation organized under the act, it was provided, must, before commencing business, have applications for insurance upon at least 250 lives for $1,000 each, and, where any such association did not have membership sufficient to pay the full amount of the certificate on an assessment, the association was required to signify in red ink on the application that the benefit was payable only in event that sufficient be collected upon an assessment to meet it. In 1896 the Royal Highlanders organized under this latter statute. For a period of two years, up to January 1, 1898, the association issued what was called its "pioneer certificates." These contained provisions providing for the payment of the face of the policy as an endowment, in instalments of 10 per cent. a year, to members who reached the age of 50 years and had been a member in good standing for 20 years or more.

In 1919 the association amended its by-laws, the object and purpose of which amendment was to cancel the endowment provisions and hold them nugatory. It is argued that this was authorized under the reserve power of the society to amend its by-laws. The reserve power is based upon the provision in the by-laws and in the application for insurance, by which the member agreed to be bound by any future changes in the edicts of the society. Though such an agreement with the parties, reserving power to the society to amend its by-laws, would authorize it to raise its rates and adopt reasonable amendments affecting the relationship between the members as insurers, so far as such regulations might affect the organization, government

or internal workings of the order, such a provision does not authorize the society to cancel its contractual obligations. As pointed out in *Case v. Supreme Tribe of Ben Hur*, 106 Neb. 220 an increase in assessments is quite a different matter from a reduction of benefits specified in the policy. The reserve power, based upon an agreement of such a kind, does not authorize the society to reduce or change benefits which it has contracted to pay, where the contract to pay the benefit is one which the law recognizes as valid in its inception. *Newhall v. Supreme Council, A. L. H.*, 181 Mass. 111; *Gaut v. Supreme Council, A. L. H.*, 107 Tenn, 603, 55 L. R. A. 465; *Russ v. Supreme Council, A. L. H.*, 110 La. 588; *Knights Templars' & Masons' Life Indemnity Co. v. Jarman*, 104 Fed. 638; *Langan v. Supreme Council, A. L. H.*, 174 N. Y. 266; *Supreme Lodge, Knights of Honor v. Bieler*, 58 Ind. App. 550; *Richey v. Sovereign Camp, W. O. W.*, 184 Ia. 10; *Shepperd v. Bankers Union of the World*, 77 Neb. 85.

It is further contended, however, that by reason of the provisions of the 1895 statute the endowment feature in these pioneer certificates was unenforceable, either as being an illegal contract or as being *ultra vires* of the powers of the association.

The 1895 law was entitled: "An act to regulate the organization and operation of mutual benefit associations, life insurance and life insurance companies."

Section 1 of the act is as follows: "Every corporation or association organized under the laws of this state upon the mutual assessment, cooperative or natural premium plan, for the purpose of insuring the lives of individuals, or of furnishing benefits to the widows, heirs, orphans or legatees of deceased members, *or of paying endowments* or accident indemnity, shall, before commencing business, comply with the provisions of this act."

Those representing the holders of the pioneer certificates argue that this provision of the statute recognizes the right of the associations named in the section to provide for the payment of endowments to the members. The petitioners

and the association, on the other hand, point out that the writing of endowments is expressly prohibited by section 16 of the same chapter, being a part of the act and enacted at the same time as section 1. Section 16 is as follows:

"Any corporation or association doing business in this state, which provides, in the main, for the payment of death losses or accident indemnity by any assessment upon its members or upon the natural premium plan, shall, for the purpose of this act, be deemed a mutual benefit association, and shall not be subject to the general insurance laws of this state, regulating life insurance. *No corporation or association, operating upon the assessment plan, promising benefits upon any other event than that of the death or disability resulting from accident to the member shall be permitted to do business in this state.* This act shall not relieve any corporation or assessment association, now doing business in this state, from the fulfilment of any contract heretofore entered into with its members under its policies or certificates of membership, nor shall any member be released hereby from his or her part of said contract."

It is to be noted that the prohibition found in section 16 literally applies only to those companies operating upon the "assessment plan." It is the argument of the representatives of the holders of the pioneer certificates that the term "assessment plan," as used in this section, was intended to designate those mutual benefit associations which made their assessments upon the members after a loss had occurred, and when the amount, necessary to pay the loss, had become determined. It is argued that such associations, operating under what counsel denominates as the "pass the hat" plan, are the only associations which are purely assessment associations, and that the association which collects regular payments from its members, with the idea of thus accumulating from the parties in advance only sufficient to pay the current losses as they occur, and with power to change the rate of assessment from

time to time as necessary, is not an association operating upon the "assessment plan."

It may be that the legislature intended to make a distinction between associations which operated upon the assessment plan and those operating upon the "natural premium" plan. The two terms are used in seeming contradistinction to each other in the first sentence of section 16. The natural premium plan, as we understand it, was based upon such a schedule of rates that each member was required to pay, during each year, the cost of insurance for him at his attained age for that year. Each member as he went along, in theory, paid the full cost of carrying his individual certificate, thus supposedly obviating the necessity of making assessments. The testimony shows, however, that some companies, operating upon the natural premium plan, were, in a broad sense, assessment companies.

The legislature may have considered that some of the associations, described in section 1, which were brought within the act were associations which did not operate upon what was generally known to be the assessment plan, and, if so, the prohibition found in section 16 was not intended to apply to them. If, on the other hand, section 1 refers to companies only which operated under what was known to be the assessment plan, then the prohibition found in section 16, if section 1 should be construed to authorize the writing of endowments, would be directly contradictory of that authorization found in section 1.

The chapter, considered in its entirety, seems to us to contemplate that those companies covered by it were all companies which operated upon some plan of assessment basis. The regulations throughout have largely to do with assessments. In section 4 *"each association organized under this act"* is required to indicate on its policy that benefits are contingent on the amount of an assessment to meet them, wherever the membership in any such association is not sufficient to pay the full amount of a certificate *on an assessment.* It would appear that the legislature

throughout the act was speaking of assessment companies only.

The by-laws of the Royal Highlanders association contained a provision setting forth a schedule of rates, and it was provided that the member, upon his entrance into the society, and where he procured a benefit certificate to be issued to him, should agree to pay a certain amount according to his attained age at the time of entrance. The schedule is as follows:

| Age at Nearest Birthday | $500 | $1,000 | $2,000 | $3,000 |
|---|---|---|---|---|
| From 18 to 27 years ....... | .20 | .40 | .80 | 1.20 |
| From 28 to 32 years ....... | .30 | .50 | 1.00 | 1.50 |
| From 33 to 37 years ....... | .30 | .60 | 1.20 | 1.80 |
| From 38 to 43 years ....... | .40 | .80 | 1.60 | 2.40 |
| From 44 to 47 years ....... | .50 | .90 | 1.80 | |
| From 48 to 49 years ....... | .60 | 1.20 | 2.40 | |
| From 49 to 50 years ....... | .70 | 1.40 | 2.80 | |

The certificate provided that these assessments should be paid monthly. By another provision of the by-laws, the executive castle, being the representative body of the association, composed of the general officers and the delegates from the tributary bodies, was given the right to fix the rates of assessment. As these rates were fixed by the by-laws, it was necessary for the executive castle to change the rates, according to the rules of the order for amending by-laws, at a special or general session. Each member in addition to these assessments was also charged dues which were in the nature of a *per capita* tax of not more than $1 a year.

It is argued by the representatives of the holders of the pioneer certificates that this plan of operation was a stipulated premium plan, and not an assessment plan of insurance, as the rates were due at regular intervals and were fixed by the contract with the member. It cannot be said, however, that the assessments were unalterably fixed by the contract, for the contract itself contained the usual provision that the member agreed that "The edicts of the executive castle of the Royal Highlanders, now in force, or

that may hereafter be adopted, shall form the basis of this contract for beneficial membership;" and "This application and the laws of the executive castle now in force, or that may hereafter be adopted, are made a part of the contract between myself and the executive castle, and I for myself and my beneficiary or beneficiaries, agree to conform to and be governed thereby." Unquestionably, the society had the right to amend its by-laws and change its rates in such a manner as was found necessary from time to time to carry out and perform the obligations which it had undertaken by its insurance contract, so far as that contract was valid and legal. *Funk v. Stevens*, 102 Neb. 681; *Fowler v. Sovereign Camp, W. O. W.*, 106 Neb. 192; *Case v. Supreme Tribe of Ben Hur, supra.*

We think the Royal Highlanders association, under its plan, as above set out, comes clearly within what was generally known to be an association operating upon the assessment plan. *State v. Root*, 83 Wis. 667, 19 L. R. A. 271; *Mutual Reserve Life Ins. Co. v. Roth*, 122 Fed. 853; *Hayden v. Franklin Life Ins. Co.*, 136 Fed. 285; *Haydel v. Mutual Reserve Fund Life Ass'n*, 98 Fed. 200; *Moran v. Franklin Life Ins. Co.*, 160 Mo. App. 407; *Westerman v. Supreme Lodge, K. of P.*, 196 Mo. 670.

It is true that in Missouri the legislature has defined the term "assessment plan," but the reasoning in the Missouri cases, in the discussion of that definition, brings out what we believe to be the general acceptation of the term.

Our conclusion, then, being that the Royal Highlanders was an association operating upon the assessment plan, as that term is used in the statute, the question remains as to how far the provisions of the statute may be held to be effective in preventing such association from writing endowment insurance, and how far those provisions of the statute can be held to render the contracts to pay endowments void and unenforceable, as being beyond the extent of the powers of the association, or as being prohibited as in violation of the declared public policy of the state.

The provisions of the act are not clear statements of the

exact intention of the legislature. Section 1 does not pur-
port to be an express grant of the powers specified to those
associations which should be organized under the act,
though it seems to be an indefinite recognition that such
companies should have those powers. Such a recognition
of powers in associations to be organized under the act may
be logically construed as an intention to grant to them the
powers so enumerated. 14A C. J. 259, sec. 2097.

Section 1, standing alone then, had it not been for the
prohibition contained in section 16, might well have been
construed as a grant of power to the associations to write
endowment insurance.

But by section 16 we find a prohibition, declaring that
any association, operating upon the assessment plan, if it
promises benefits upon any other event than that of the
death or disability of its members, shall not be permitted
to do business in this state. The two sections of the statute,
taken together, and each of them given the interpretation
of which they are individually capable, lead to the result
that section 1 purports to be a grant of authority to write
endowment insurance, while section 16 declares that if any
company, so authorized to write endowment insurance,
should do so, it should not be permitted to do business in
the state. The two provisions, thus construed, lead to an
absurdity. The prohibition in section 16 is, furthermore,
not a clear and definite statement that such associations
shall not have the power to write endowment insurance, but
purports to be simply a limitation upon their right to do
business. The fact, standing alone, that they were unlaw-
fully permitted to do business in the state would be no de-
fense to their contracts.

The intent of the legislature, as gathered from the entire
statute, cannot be said to be clear beyond doubt or am-
biguity. It is open to construction. The officers, to whom
the enforcement of the provisions of the statute has been
delegated, as well as the society itself, have construed the
uncertain and ambiguous provisions of the statute as an
authorization to this company to write endowment insur-

ance.  In 1896, when the Royal Highlanders association
was organized, its articles and by-laws were submitted to
the auditor and to the attorney general, as provided by
the statute, and the plan of operation of the society was
approved and permission granted to operate upon the
plan presented.  The by-laws submitted to these officers set
forth the form of benefit certificate which the association
proposed to use.  This form contained the endowment pro-
vision which is now found embodied in the pioneer certifi-
cates in controversy.  For 23 years the society has not
questioned the validity of those endowment provisions.  It
furthermore appears that counsel for the association, in
his report to the society in 1919, recommending that a
by-law be enacted to cancel the endowment provisions,
premised his remarks with a statement that the laws of
Nebraska, existing at the time of the organization of the
society and the issuance of the certificates, authorized the
writing of such provisions.

The contemporaneous construction placed upon a statute
by those charged with its execution, where such construc-
tion has long prevailed and been recognized by the parties
who are concerned and who are ruled by the statute, will
not be disregarded, unless it is clear that such construction
was erroneous.  The statute is not so clear that it is free
from doubt as to what the legislature intended, and we
find no cogent reason for disturbing contractual obliga-
tions which have grown up based upon that construction,
and which have existed and been recognized by the society
for so many years.  *Clark's Run & S. R. Turnpike Road
Co. v. Commonwealth*, 96 Ky. 525; *City of Louisville v.
Louisville Water Co.*, 105 Ky. 754; *Van Veen v. Graham
County*, 13 Ariz. 167; *The Allan Wilde*, 264 Fed. 291; *Mori-
arty v. City of New York*, 110 N. Y. Supp. 842; *Mont-
gomery Light & Traction Co. v. Avant*, 202 Ala. 404, 3 A.
L. R. 384; *Laub v. Furnas County*, 104 Neb. 402; *State v.
Holcomb*, 46 Neb. 88; 25 R. C. L. 1043, sec. 274; 26 Cyc.
1139.

It is beyond question that the society has failed to re-

quire of these members in the past payments sufficient in
amount to cover the cost of carrying the endowment pro-
visions.    Moreover, the payments have been insufficient
even to cover the cost of meeting the other benefit provi-
sions, exclusive of endowments.    The society had the
power, however, and should have exercised it, to raise
rates to such an extent as to make them adequate.    It
cannot defend upon the ground that it has not done so.

The endowment provisions of these certificates are of
added value, and an additional assessment, to cover the
difference between the cost of carrying the policy with the
endowment and the cost of carrying it without that pro-
vision, would have been justified.

In all other respects, aside from the endowment pro-
vision, the certificate provisions of the entire membership
are the same, and, as to those provisions, held in common
by all members in the society, the society was, of course,
compelled to preserve absolute mutuality; but it was not
compelled, nor was it even proper, as we view it, to require
the members at large, who had no endowment provision
in their policies, to pay the same rates as those members
who were to receive endowments.    The members at large
could not justly be called upon to contribute to the pay-
ment of benefits in which they did not share.    It seems to
us that the society should, from the time it ceased writing
endowment provisions, January, 1898, have charged an ad-
ditional assessment to the holders of those certificates, ac-
cording to the added value or cost of carrying the endow-
ment provision.    As the situation now stands, the pioneer
certificate holders have a vested interest in their contracts
and in the funds which the society has accumulated.    Of
these rights they cannot justly be deprived.    We see no rea-
son why the society should not now amend its by-laws so
as to require the holders of pioneer certificates to elect be-
tween surrendering the endowment provision or paying
from this time forward an additional amount sufficient to
cover the cost of carrying it, provided no discrimination is

made against them as to the assessments to cover the other provisions of their certificates.

The judgment of the district court is therefore

AFFIRMED.