## MUTUAL RESERVE LIFE INS. CO. v. ROTH.

(Circuit Court of Appeals, Eighth Circuit. April 20, 1903.)

### No. 1,807.

1. LIFE INSURANCE—FORFEITURE FOR NONPAYMENT OF PREMIUM—MISSOURI STATUTE.

Rev. St. Mo. 1879, § 5983, which provides that no life insurance policy on which two full annual premiums have been paid shall become forfeited by reason of the nonpayment of premium thereon, but that in such case three-fourths of the net value of the policy, less any indebtedness of the holder, shall be applied as a single premium to extend the insurance, was enacted with special reference to that class of policies termed "ordinary life" or "endowment," where the premium remains fixed or level during the lifetime of the insured, or so long as premiums are payable, which gives such policies an actual net value after the payment of a few premiums; and it cannot be applied to policies or benefit certificates issued on the assessment or natural premium plan, on which the assessments are limited to such sum as is necessary to cover the actual cost of insurance from one renewal period to another, and which therefore have no accumulated or actual net value.

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

This is an action on an insurance policy in the sum of $10,000, dated January 9, 1884, which was issued by the Mutual Reserve Fund Life Association on the life of Adam Roth, who died in the city of St. Louis, Mo., where he resided, on June 20, 1900. The action was originally brought by Margaret Roth, the widow of Adam Roth, against the Mutual Reserve Fund Life Association, which has since changed its name and become the Mutual Reserve Life Insurance Company. Margaret Roth died, as it seems, after the institution of the suit; and the case was prosecuted in her behalf in this court by Caroline G. Roth, as executrix of the estate of Margaret Roth.

When the action was brought, the defendant company answered that the policy sued upon lapsed and became void on account of the failure of the deceased to pay a bimonthly assessment which was levied and became due and payable on November 1, 1899, and that it was not in force on June 20, 1900, when Adam Roth died. To this defense the plaintiff below replied, in substance, that at the time of the alleged lapse the policy in question had a net value incident to the payment of previous premiums, which net value, by virtue of section 5983 of the Revised Statutes of Missouri for the year 1879, operated to extend the insurance for a period which did not expire until subsequent to June 20, 1900, when Adam Roth died. At the conclusion of the trial the lower court, being of the opinion that by virtue of the statute aforesaid the policy was in force on June 20, 1900, although the assessment which became due and payable on November 1, 1899, was not paid, directed the jury to return a verdict in favor of the plaintiff, which was accordingly done, whereupon the Mutual Reserve Life Insurance Company, the present plaintiff in error, sued out a writ of error.

The statute of the state of Missouri (section 5983, Rev. St. 1879) on which the decision of the case was made to turn is as follows:

"Policies Non-Forfeitable, When. No policy of insurance on life hereafter issued by any life insurance company, authorized to do business in this state, on and after the first day of August, A. D. 1879, shall, after payment upon it of two full annual premiums be forfeited or become void, by reason of the non-payment of premium thereon, but it shall be subject to the following rules of commutation, to-wit: The net value of the policy, when the premium becomes due and is not paid, shall be computed upon the American experience table of mortality, with four and one-half per cent. interest per annum, and after deducting from three-fourths of such net value any notes or other indebtedness to the company, given on account of past premium payments on said policy issued to the insured, which indebtedness shall then be canceled, the balance shall be taken as a net single premium for temporary insurance for the full amount written in the policy, and the term for which such temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium and the assumption of mortality and interest aforesaid; but if the policy shall be an endowment, payable at a certain time or at death, if it should occur previously, then if what remains as aforesaid, shall exceed the net single premium of temporary insurance for the remainder of the endowment term for the full amount of the policy, such excess shall be considered as a net single premium for a pure endowment of so much as such premium will purchase, determined by the age of the insured at date of defaulting the payment of premium on the original policy and the table of mortality and interest as aforesaid, which amount shall be paid at end of the original term of endowment, if the insured shall then be alive."

J. C. Jones (William C. Jones, Lon O. Hocker, George Burnham, Jr., and Sewell T. Tyng, on the brief), for plaintiff in error.

F. H. Bacon and John E. McKeighan, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

We are of opinion that, when the trial ended, all of the material facts in the case were practically confessed, and that the learned trial judge was right in holding that the only question involved was one of statutory construction arising upon the aforesaid statute. All of the actuaries who testified in the case (and there were several) agreed that the net value of a policy at any time is the difference between the single premium necessary to purchase the sum assured, estimated on the age of the person at the time the policy is valued, and the then pres-

ent value of all the future premiums expected to be received on the policy. The net value of a policy is sometimes termed the reserve on the policy, and represents a sum of money already collected, which is supposed to be in the hands of the insurer, and available in its hands either to reinsure the risk in some other company, or to enable it, with the aid of the premiums thereafter payable, to meet the risk at the end of the party's expectancy. The net value of a policy is computed, of course, on a given table of mortality, at a specified rate of interest, and upon the assumption that during the early years of the risk, the premium being the same each year, the insured pays more than the actual cost of insurance; the excess which is thus paid making good the deficit during the later years, when it costs more to carry the risk. New York Life Ins. Co. v. Statham, 93 U. S. 24, 34, 23 L. Ed. 789. All of the actuaries agree on the foregoing proposition. The actuaries further agreed, we think, that, under the provisions of such a policy as was issued to Roth, it did not have an actual net value; that is to say, they agreed that the defendant company had not accumulated any sum of money to help carry the risk to maturity, because the policy did not stipulate for the payment of a fixed or uniform premium annually, like an ordinary life policy, but contained provisions which necessarily made the premiums variable, by limiting them to such amounts as were necessary to meet death losses as they occurred.

The policy in suit contained a provision making it payable out of what is termed the "Death Fund" of the association, and a further provision that if, at such time as the directors of the association might fix for making an assessment, the death fund should be insufficient to meet existing death claims, an assessment should be made upon every member whose certificate was in force at the date of the death for which the assessment was made, said assessment to be made at such rates, according to the age of each member, as might be established by the directors, and that the net amount of such assessment, less 25 per cent. to be set apart for the reserve fund, should go into the death fund. The policy further stated that "no assessments will be made while there remains in the death fund a sum sufficient to pay the existing claims in full." The constitution of the order, which was made a part of the contract, provided that on the 1st days of February, May, August, and November an assessment should be made upon the entire membership in force at the date of the last audited death claim prior thereto, for such a sum as the executive committee might deem sufficient to meet the existing claims by death, the sum to be apportioned among the members according to the age of each member as per the rates named in the certificates of membership, and that the net amount received from such assessments, less 25 per cent. to be set apart for the reserve fund, should go into the death fund. Other provisions of the constitution declared that the interest on the reserve fund, as it accrued, should be placed to the credit of the death fund, to be used in providing for current death claims; that after the expiration of each period of five years, during the continuance of a membership certificate, a bond should be issued to the member, bearing interest at the rate of 4 per cent. per annum, for an equitable proportion of each member's interest in the reserve fund, which bond

should be available after 10 years from its date to pay the future assessments levied against the member; and that the entire reserve fund above $100,000, and in excess of sums represented by outstanding bonds, might be applied to the payment of death claims in excess of the American experience table of mortality, and when any claim by death was due, to make up any deficiency that might then exist in the death fund.

It is manifest, therefore, that, according to the contract existing between the parties, the premiums payable were not to remain fixed or level during the life of the policy, but were expressly made indefinite in amount, and dependent upon the mortuary necessities of the company. This fact was disclosed by a table of rates of assessment indorsed on the back of the policy, which showed that the rates of assessment increased as the member grew older. In other words, the contract in suit was one whereby the member was required to pay from one assessment period to another the actual cost of insurance during that period, without paying an additional sum to be husbanded and accumulated to make up a deficit in future years, when the cost of carrying the risk on the member's life became greater. All of the actuaries agreed that when insurance is conducted on this plan, which may be called either "term insurance," or "insurance on the natural premium plan," a policy can have no actual net value; and that fact is obvious, because, if an insurance company collects from its policy holders, from one assessment period to another, no more than is necessary to pay losses which occur in the meantime, it can have nothing in its treasury to reinsure outstanding risks, or give them a net value.

Only one of the actuaries who testified at the trial claimed that the policy in suit had a net value on November 1, 1899, applicable to the purchase of extended insurance; and the net value which he assigned to it was not an actual net value incident to the payment of assessments previous to that time, but a theoretical net value, which, as he contended, might and ought to be given to it under the provisions of the Missouri statute, to wit, section 5983, Rev. St. Mo. 1879, above quoted, and section 5968 of the same chapter. The last-mentioned section (5968) provided, in substance, that it should be the duty of the State Superintendent of Insurance to make or cause to be made annually a valuation of the policies and all other obligations of insurance outstanding and in force on December 31st next preceding, of every life insurance company doing business in the state, and also provided that for the purpose of making such a valuation, and for making special examinations under the provisions of the laws of the state, in order to ascertain the solvency of insurance companies, and their eligibility to do business in the state, the rate of interest assumed should be 4½ per cent. per annum, and that the rate of mortality should be that established by the American experience table, in which table the numbers living and dying at each age, and the expectation of life from the ages of 10 to 95 out of 100,000 persons living at the age of 10, were as stated in a schedule appended to that section, which is quoted below in a note. While no rate of premium was prescribed by that section, but was apparently left to the agreement of the par-

ties, yet the plaintiff's actuary claimed that, by reference to the table and the prescribed rate of interest, a table of such premium rates as ought to be charged for a given amount of insurance at any age from 10 to 95 might be constructed. Pursuing this theory, the actuary computed the net level annual premium on a policy of $10,000 at the age of 57 (that being the age of the deceased at the time he was insured, and the amount of his policy), and fixed the annual premium at $460.70, and on the assumption that this premium had been regularly paid, or that it ought to have been collected, from the time the policy was issued up to November 1, 1899, computed or estimated the net value of the policy to be $4,423.20, three-fourths of which amount, to wit, $3,317.40, was a sum adequate to purchase extended insurance for 4 years and 282 days from November 1, 1899, or until August 10, 1904. The actuary conceded that in making this calculation he had "ignored absolutely the conditions of paying premiums and the method of collecting assessments," and had based his computation solely on the statute; taking no account of the provisions of the contract, or the amount of premiums which had been actually paid.

As there is no evidence in the record that the policy in suit had a net value, other than such theoretical net value as is last described, and as all the actuaries other than the plaintiff's actuary declared that, owing to the method of levying assessments which had been prescribed and followed, it had no actual or computable net value, the question to be determined is whether the statute means that all life policies of insurance on which premiums have been paid for as much as two years must be treated as having an arbitrary net value for the purpose of purchasing extended insurance, regardless of the amount that has been paid, and regardless of the agreement between the parties concerning the payment of premiums. We think that the statute will not fairly bear such a construction. It is a statute which is said to have been borrowed from the state of Massachusetts, where a very similar law was once in force. Laws Mass. 1861, c. 186. From the discussions which preceded the adoption of the statute in the state of Massachusetts, it is evident that it was passed to prevent the injustice of forfeiting policies for nonpayment of premiums due thereon when the insurer had in its hands, as the result of premiums already paid thereon, a sum of money, termed the "reserve," representing what had been collected in excess of the actual cost of insurance up to the time of the default. It was this reserve—a sum actually paid, and equitably belonging to the policy holder—that the lawmaker intended to say should be applied to prolong the life of the policy. The same motives which led to the enactment of the statute in Massachusetts doubtless led to its enactment in the state of Missouri; that is to say, the Legislature intended to secure to policy holders the benefit of the reserve on their policies if they had paid "two full annual premiums," and not permit the reserve to be forfeited or appropriated by the insurer. It is a well-known fact that the forfeiture of such reserve values for nonpayment of premiums had become a source of great profit to insurance companies, because the premiums which they were in the habit of exacting from the insured on life policies were so fixed as to be considerably in excess of the cost of simply carrying the

risk from one annual period to another so as to accumulate a reserve. The Legislature deemed it inequitable to deprive the insured of the benefit of payments which he had actually made; hence the statute provided that, in case of a lapse for the nonpayment of a premium, the amount of the reserve should be computed according to tables which were used by the insurance companies themselves, and that the amount of the reserve or net value should be applied to the purchase of extended insurance. This view—that the Legislature had in mind an actual net value which a policy had acquired as the result of the payment of premiums—is strengthened by the fact that, when the statute in question was enacted in Massachusetts and Missouri, there were very few insurance companies then engaged in business which issued policies or benefit certificates on what is now commonly known as the "assessment plan" or the "natural premium plan"; that is to say, companies who limited their assessments to such a sum as was necessary to cover the actual cost of insurance from one renewal period to another. As this form of insurance was little known, and was not practiced to any considerable extent, at the time the statute was adopted, it can hardly be presumed that it was intended to apply to insurance policies or benefit certificates issued according to that plan, which have in fact no computable or actual net value. If the act is held applicable to that class of policies, it will not have the equitable operation that it was intended to have, but will in fact have the opposite effect, by giving to the policy holder something for nothing; that is, insurance which he has never paid for. We cannot, therefore, give the statute that construction, because to do so would, in our judgment, distort it from its true purpose. Statutes should always be construed so as to give effect to the intention of the lawmaker, when that intention can be ascertained with reasonable certainty. For the purpose of ascertaining the intention of the lawmaker, a court is not confined exclusively to the language of the act, although its language must be given due weight, but should consider as well the circumstances which led to its adoption, and the evil that it was designed to remedy. When this is done, it is competent for a court to declare that a thing which may be within the letter of a statute is not governed by the statute, because it is neither within its spirit, nor within the intention of the lawmaker. The reason of the law in such cases, as has sometimes been said, should prevail over its letter. Church of the Holy Trinity v. United States, 143 U. S. 457, 461, 462, 463, 12 Sup. Ct. 511, 36 L. Ed. 226; United States v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278; United States v. Union Pacific Railroad Co., 91 U. S. 72, 79, 23 L. Ed. 224; United States v. Freeman, 3 How. 556, 565, 11 L. Ed. 724; Chauncey v. Dyke Bros. (C. C. A.) 119 Fed. 1, 9.

Applying these rules of statutory construction to the statute in question, and considering the equitable object which it was intended to accomplish, and the conditions existing at the time it was adopted, we feel constrained to hold that it was enacted with special reference to that class of policies termed "ordinary life" or "endowment," where the premium remains fixed or level during the lifetime of the insured, or so long as premiums are payable. It was framed, we think, on the assumption that the premiums on ordinary life and endowment

policies are fixed at a rate which gives them an actual net value or a reserve after the payment of a few annual premiums. As the statute, according to our view, was enacted with special reference to ordinary life and endowment policies, where the premiums remain level or uniform, it should be confined in its operation to policies of that class, and not applied to a class of policies which were not within the contemplation of the lawmaker.

It results from these views that the judgment below was erroneous, and should be reversed, and the case remanded for a new trial. It is so ordered.

NOTE.

Schedule—Table of Mortality Based on American Experience.

| Age. | No. Living at Each Age. | No. Dying. | Expectation of Life. | Age. | No. Living at Each Age. | No. Dying. | Expectation of Life. |
|---|---|---|---|---|---|---|---|
| 10 | 100,000 | 749 | 48.72 | 53 | 66,797 | 1,091 | 18.75 |
| 11 | 99,251 | 746 | 48.08 | 54 | 65,706 | 1,143 | 18.09 |
| 12 | 98,505 | 743 | 47.45 | 55 | 64,563 | 1,199 | 17.40 |
| 13 | 97,762 | 740 | 46.80 | 56 | 63,364 | 1,260 | 16.72 |
| 14 | 97,022 | 737 | 46.16 | 57 | 62,104 | 1,325 | 16.05 |
| 15 | 96,285 | 735 | 45.50 | 58 | 60,779 | 1,394 | 15.39 |
| 16 | 95,550 | 732 | 44.85 | 59 | 59,385 | 1,468 | 14.74 |
| 17 | 94,818 | 729 | 44.19 | 60 | 57,917 | 1,546 | 14.10 |
| 18 | 94,089 | 727 | 43.53 | 61 | 56,371 | 1,628 | 13.47 |
| 19 | 93,362 | 725 | 42.87 | 62 | 54,743 | 1,713 | 12.86 |
| 20 | 92,637 | 723 | 42.20 | 63 | 53,030 | 1,800 | 12.26 |
| 21 | 91,914 | 722 | 41.53 | 64 | 51,230 | 1,889 | 11.67 |
| 22 | 91,192 | 721 | 40.85 | 65 | 49,341 | 1,980 | 11.10 |
| 23 | 90,471 | 720 | 40.17 | 66 | 47,361 | 2,070 | 10.54 |
| 24 | 89,751 | 719 | 39.49 | 67 | 45,291 | 2,158 | 10.00 |
| 25 | 89,032 | 718 | 38.81 | 68 | 43,133 | 2,243 | 9.47 |
| 26 | 88,314 | 718 | 38.12 | 69 | 40,890 | 2,321 | 8.97 |
| 27 | 87,596 | 718 | 37.43 | 70 | 38,569 | 2,391 | 8.48 |
| 28 | 86,878 | 718 | 36.73 | 71 | 36,178 | 2,448 | 8.00 |
| 29 | 86,160 | 719 | 36.03 | 72 | 33,730 | 2,487 | 7.55 |
| 30 | 85,441 | 720 | 35.33 | 73 | 31,243 | 2,505 | 7.11 |
| 31 | 84,721 | 721 | 34.63 | 74 | 28,738 | 2,501 | 6.68 |
| 32 | 84,000 | 723 | 33.92 | 75 | 26,237 | 2,476 | 6.27 |
| 33 | 83,277 | 726 | 33.21 | 76 | 23,761 | 2,431 | 5.88 |
| 34 | 82,551 | 729 | 32.50 | 77 | 21,330 | 2,369 | 5.49 |
| 35 | 81,822 | 732 | 31.78 | 78 | 18,961 | 2,291 | 5.11 |
| 36 | 81,090 | 737 | 31.07 | 79 | 16,670 | 2,196 | 4.74 |
| 37 | 80,353 | 742 | 30.35 | 80 | 14,474 | 2,091 | 4.39 |
| 38 | 79,611 | 749 | 29.62 | 81 | 12,383 | 1,964 | 4.05 |
| 39 | 78,862 | 756 | 28.90 | 82 | 10,419 | 1,816 | 3.71 |
| 40 | 78,106 | 765 | 28.18 | 83 | 8,603 | 1,648 | 3.39 |
| 41 | 77,341 | 774 | 27.45 | 84 | 6,955 | 1,470 | 3.08 |
| 42 | 76,567 | 785 | 26.72 | 85 | 5,485 | 1,292 | 2.77 |
| 43 | 75,782 | 797 | 26.00 | 86 | 4,193 | 1,114 | 2.47 |
| 44 | 74,985 | 812 | 25.27 | 87 | 3,079 | 933 | 2.18 |
| 45 | 74,173 | 828 | 24.54 | 88 | 2,146 | 744 | 1.91 |
| 46 | 73,345 | 848 | 23.81 | 89 | 1,402 | 555 | 1.66 |
| 47 | 72,497 | 870 | 23.08 | 90 | 847 | 385 | 1.42 |
| 48 | 71,627 | 896 | 22.36 | 91 | 462 | 246 | 1.19 |
| 49 | 70,731 | 927 | 21.63 | 92 | 216 | 137 | .98 |
| 50 | 69,804 | 962 | 20.91 | 93 | 79 | 58 | .80 |
| 51 | 68,842 | 1,001 | 20.20 | 94 | 21 | 18 | .64 |
| 52 | 67,841 | 1,044 | 19.49 | 95 | 3 | 3 | .50 |