W. L. MAGERS, Trustee, v. THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, a Corporation, Appellant.—152 S. W. (2d) 148.

Division One, April 18, 1941.
Rehearing Denied, June 12, 1941.

*Maurice H. Winger* and *George J. Winger* for appellant; *Norman L. Baker* and *Winger, Reeder & Barker* of counsel.

*Harry A. Hall, Goodwin Creason* and *Carl E. Kimpton* for respondent.

*E. R. Morrison, W. B. Cozad* and *Morrison, Nugent, Berger, Byers & Johns, amici curiae.*

*Watson, Ess, Groner, Barnett & Whittaker* and *Douglas Stripp, amici curiae.*

*Henry I. Eager* and *Kenneth E. Midgley* for Metropolitan Life Insurance Company and The Prudential Insurance Company of America, *amici curiae.*

 HYDE, C.—This is an action, in two counts, upon two insurance policies. Plaintiff had verdicts on both counts. Judgment was entered for the total sum of $21,253, from which defendant has appealed.

 Plaintiff has filed a motion to dismiss the appeal. He claims that defendant's statement violates our Rule 15; that its assignments of error are broader than the grounds stated in its motion for new trial; and that its points and authorities are abstract statements of law insufficient to present anything for review. Upon careful consideration, we find defendant's statement to be sufficient. While defendant makes assignments of error concerning admission of evidence, giving of plaintiff's instructions, and refusal of its instructions, we find these to be abandoned by failure to mention them in its points and authorities. [Clay v. Owen, 338 Mo. 1061, 93 S. W. (2d) 914; Homan v. Missouri Pac. Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617, and cases therein cited.] However, defendant assigns as error the refusal of its "Instruction B in the nature of a demurrer to the evidence at the close of all the evidence." This ground was stated in its motion for new trial. We will, therefore, consider only this assignment, as to which we find that defendant's points and authorities and argument make its contentions clear. (From the extensive briefs filed, we note that this issue is fully understood by plaintiff.) We, therefore, overrule the motion to dismiss.

 The sole question actually presented is: What is the meaning of the term "net value" as used in the Missouri nonforfeiture statute? [Sec. 5852, R. S. 1939; Sec. 5741, Mo. Stat. Ann. 4388.] Both parties agree as to the meaning of the term "reserve," as used in life insurance; but they do not agree as to whether the term "net value" is the same thing or has a different meaning.

The applicable part of this nonforfeiture statute (Sec. 5852) is, as follows:

"No policies of insurance on life hereafter issued by any life insurance company authorized to do business in this state shall, after payment upon it of three or more annual payments, be forfeited or become void by reason of nonpayment of premiums thereon, but it shall be subject to the following rules of commutation, to-wit: *The net value* of the policy, when the premium becomes due and is not paid, shall be computed upon the actuaries' or combined experience table of mortality with four per cent interest per annum, and after deducting from three-fourths of such net value the unpaid portion of any notes given on account of past premium payments on said policy and any other indebtedness to the company secured by said policy, which notes and indebtedness shall then be canceled, the balance shall be taken as a net single premium for temporary insurance (extended insurance)." (The rest of the section relates to the amount and term of the temporary insurance.)

The following facts were conceded as to the insurance policies, issued in this case by defendant. James McQuenny (hereinafter called the insured) was issued an ordinary life policy for $12,000, at age 49, on May 16, 1923. The annual premium (in quarterly payments) was at the gross rate of $45.76 per $1000 insurance. (It was $44.43 in one annual payment in advance.) This premium was paid in quarterly payments of $137.28. Insured borrowed $2761.44 on this policy, which lapsed on November 16, 1932. Insured was issued another ordinary life policy for $5000, at age 50 on August 14, 1923. The annual gross premium (in quarterly payments) was at the rate of $47.76 per $1000 of insurance. (It was $46.36 in one annual payment in advance.) This premium was paid in quarterly payments of $59.70. Insured borrowed $1123.54 on this policy, which lapsed on November 14, 1932. Dividends on both policies were used in reduction of premiums. After lapse, insured was notified that temporary insurance, ▆▆▆ provided after cancellation of indebtedness, on the first (larger) policy expired on November 22, 1932, and such insurance likewise provided on the second policy expired on March 24, 1933. The insured died August 24, 1933. It is also conceded that if the ''net value'' of these policies are computed upon the net premium basis (as it is conceded the policy ''reserve'' is computed), there would not be enough value, under the nonforfeiture statute plan, to carry them as extended insurance to the date of the insured's death. In fact under the statutory plan (deduction of one-fourth) there would not be sufficient value to pay the policy loans. Thus, if ''net value'' is computed on the basis of net premiums, the policy provisions for ''net value'' were more favorable to the insured than the statute.

The annual net premiums per $1000 of insurance, based on the American Experience table of mortality used in the policy, were $34.85 on the first policy and $36.36 on the second. Net annual premiums based on the statutory table were $34.23 on the first policy and $35.78 on the second. These net premiums are the annual payments,* which with interest at the specified rate, are required to build up the exact amount necessary to pay at maturity policies of $1000, issued at the age specified, according to the mortality table used. Thus these net premiums (and interest thereon) are the source of the policy ''reserve'' which defendant says is the same thing as ''net value'' of the policy. Additional amounts are generally charged annually above such net premiums for company operating expense, agents' commissions, taxes, excess losses and profits. Such additional amounts are called the ''loading.'' In other words, the net premium is to provide funds sufficient to pay the cost of mortality (death claims estimated in the table used), the balance of the premium is to pay all other company expense, and the total is the gross premium. Plaintiff agrees that the policy ''reserve'' is computed from net

premiums only, but says that "net value" is not the same thing as "reserve."

Plaintiff's claim is based upon use of the gross premium to determine the "net value" available under each policy for temporary insurance. Plaintiff's actuary called his calculation the retrospective accumulation method. He made his computation from the statutory table showing that of 100,000 people living at age 10, there would be 70,580 living at age 49. (Age at which first policy was issued.) He multiplied 70,580 by $45.76 (the amount of the gross premium) making $3,229,740.80. He then added interest of $80,743.52 (at rate of statutory table); and deducted $1,063,000 for death payments, because the table showed 1063 would die that year. (On the basis of $1000 insurance to each.) This would leave a fund of $2,247,484.32 for 69,517 survivors, which divided equally would leave each survivor a share of $32.33, "which is the net value per thousand at the end of the first year" of the first policy in this case according to plaintiff's actuary. He further testified: "We take (again) exactly the same step, determining the number living at age 50, which is 69,517 each of them paying the same, $45.76, in the second year, to determine the premium income improved at the same rate of interest, and also the net value carried over from the first year, improved at four per cent interest, gives a total on hand in the second year of $5,598,009.06. (Before deducting death payments for that year.) . . . (After such deduction.) At the end of the second year, (leaving) $65.63 on each thousand." (Net value on each $1000 of insurance.) Plaintiff's actuary continued in this manner for each year up to date of lapse. His calculation of final values (after lapse), according to his system, was as follows:

| | $12,000 Policy | $5000 Policy |
|---|---|---|
| "The net value at the date of lapse by the Actuaries 4% Table, after deducting the tabular mortality costs in full | 4323.64 | 1773.80 |
| Statutory 25% for loading expense, etc. | 1058.16 | 443.45 |
| 3/4ths net value | 3174.48 | 1330.35 |
| Policy loans | 2761.44 | 1123.54 |
| Balance available for extended insurance | 413.04 | 206.81 |
| Net single premium for insurance from date of lapse to date of death | 250.92 | 81.62 |
| Amount unused and retained by company | $ 162.12 | 125.19" |

It should be noted that, according to the evidence of actuaries, in retrospective calculation by net premiums paid, these payments are accumulated (to any point of time after the policy was issued) by adding them, adding interest thereto and deducting therefrom the

cost of mortality, as of that time, according to the table used. In prospective valuation, the value at the same point of time is found by calculating the value of the future net premiums unpaid (discounted at the interest rate used) and deducting this from the future cost of mortality, which is the face of the policy likewise actuarially discounted. (This latter amount is the same amount as the net single premium required to pay for such an amount of insurance at that time.) This valuation (which is the amount of reserve accumulated) will be shown to be exactly the same amount (on the same date) by either method. This is true because the net premiums are based on the table used so as to meet the mortuary obligations as it shows they will accrue. Apparently this could not be true of gross premium valuations, because gross premiums are not based on any table, and are naturally in excess of the amount necessary to mature the policy.

It is apparent that the method of calculation used by plaintiff's actuary allows nothing for annual expense of operations during the years policies remain in force. Obviously also he figures interest on the part of the premium added to provide for expense (which if spent or distributed annually could not be invested at interest) as well as upon the net premium, required under the mortality table to be held and invested at interest to produce the amount necessary to pay death claims. He says that the one-fourth allowed by the nonforfeiture statute (to be retained by the company) is for the purpose of paying such operating expense. Surely it was not intended that no expense of annual operations should be paid until policies lapsed after accumulating reserves. That would be a most uncertain way to attempt to operate a business. Plaintiff cites Section 5720, R. S. 1929, 6 Mo. Stat. Ann. 4365 (hereinafter more fully considered), in support of his valuation by gross premiums. However, that section authorizes calculation of values ''by the gross premiums receivable'' (prospective valuation) and not by his retrospective method. Even so, it requires ''deducting a margin for expenses,'' based on ''the actual experience of the company.'' Certainly, therefore, this section is not authority for valuation without any allowance for annual expenses. It seems obvious for these reasons that the statutory provisions requiring only three-fourths of the net value to be used as a premium for extended insurance was not intended as an allowance for operating expenses of the company but was authority to make a surrender charge in the nature of a penalty for failure to continue to pay premiums. We must remember that before the adoption of the statute, insurance companies could forfeit and keep all of the net value. This was deemed unfair to lapsed policyholders, and perhaps experience has shown one-fourth of the net value is too much for a surrender charge; but that is for the Legislature. It is well known that many of the stronger better managed companies

now make no surrender charge against the policy reserve. We note that none was made in the policies in this case. Furthermore, plaintiff's method was not really based on actual premiums paid because insured's actual payments were reduced by dividends which made the average annual amount actually paid by him (over the entire period his policies were in force) only $34.55 on the first policy and $36.23 on the second policy. Even calculated by plaintiff's retrospective method, on this actual amount of money paid by insured, there would not have been sufficient value to keep these policies, or either of them, in force as extended insurance to the date of his death.

This Court en Banc in Westerman v. Supreme Lodge K. of P., 196 Mo. 670, l. c. 711, 94 S. W. 470, considered the meaning of the term "net value" in our nonforfeiture statute. Noting that our statute was modeled upon an earlier Massachusetts statute, this court quoted approvingly from Connecticut Ins. Co. v. Commonwealth, 133 Mass. 161, l. c. 164, as follows:

"The simplest form of carrying on the business of life insurance would be for the company to charge the policyholder each year with the sum which it costs to insure him for that year, which can be ascertained with reasonable certainty by the aid of the accepted tables of mortality. In such case, the relation between the parties would be merely that of insurer and insured. But the general practice of insurers is, instead of charging such sums, which would increase from year to year, to ascertain what these sums would average each year throughout an average life, and to charge each year such average sum. The necessary effect of this practice is that the insured, during the earlier years of the running of his policy, pays more than it costs to insure him, and thus the company accumulates from year to year a fund which in equity is held for the benefit of the policyholders. It is this feature of the business which gives existence to 'net values' within the meaning of our statutes; the 'net value' of a policy being represented by a sum which, with compound interest at the rate of four per cent per annum and with the addition of future net premiums, will provide for the payment of the policy when it matures, according to the 'combined experience,' or actuaries' table of mortality. . . . If the insured violates his contract and forfeits his policy, the company cannot treat the accumulation upon his policy as its property, but holds it for his benefit."

The St. Louis Court of Appeals fully considered this matter in Rose v. Franklin Life Ins. Co., 153 Mo. App. 90, l. c. 96, 132 S. W. 613. Statements in this case, and in Moore v. Northwestern Life Ins. Co., 112 Mo. App. 696, 87 S. W. 988, are relied upon by plaintiff but these were concerning an entirely different state of facts. The court, in the Rose case following the Westerman case, and the Massachusetts authority therein quoted, said:

"The words 'net value' being technical words are to be taken in

their technical sense. [Sutherland Statutory Construction, sec. 393, sec. 8057, R. S. 1909.]

"Their meaning is for the court, who may ascertain their meaning by referring to persons who have knowledge on the subject or by consulting books or reference containing information thereon. [Sutherland, Statutory Construction, sec. 391.]

"It is important to ascertain whether the words had a settled technical meaning before the statute was enacted as in that case we must assume that the Legislature used them in that sense. [Ruckmaboye v. Mottichund, 8 Moore (P. C.) p. 20.]

"It will also aid and should greatly influence us to a correct interpretation of the statute and the sense in which it uses the words 'net value,' to ascertain the mischievous practice or evil intended to be terminated or cured by its enactment. [Westerman v. Supreme Lodge Knights of Pythias, 196 Mo. 670, 711, 94 S. W. 470.]

"What is known in the language of life insurance as 'net value,' or 'reserve' as it is sometimes called, existed long before, either by contract or by statute, any part of it was devoted to extended insurance. [State v. Vandiver, 213 Mo. 187, 111 S. W. 911.] . . . (After reviewing the purpose of our nonforfeiture statutes as stated in the Westerman case and in Mutual Reserve Life Ins. Co. v. Roth, 122 Fed. 853.) 'Net value' is the difference between the net single premium at the attained age (the age at which lapse occurred) and the present value at that age of future premiums receivable. . . . (Prospective valuation) (because) 'Net single premium' is really only the aggregate of the future yearly costs of the insurance, severally discounted to the age from which the computation is made. . . . All of which is no more than saying that 'net value' is 'the accumulation of the balance of past net premiums not absorbed in carrying the risk.' (Retrospective valuation) . . . Both definitions mean the same thing, and followed as formulae produce exactly the same result."

The court further considered this question in Liebing v. Mutual Life Ins. Co., 269 Mo. 509, l. c. 523, 191 S. W. 250, saying:

"The gross premium consists of the net premium plus loading for expenses and contingencies, i. e. the net premium represents the 'cost of insurance.' . . . This is his proportion of the 'cost of insurance' as that term is employed. When that is ascertained and distributed over the term of his expectancy (more accurately, according to the mortality experience table used) in level or equal premium payments, or over the premium-paying period, as in this case, the early payments obviously will exceed this cost and the later ones fall short of it, since the risk in every case increases with advancing years. In the early years of the premium-paying period the policyholder, therefore, under a policy like this, pays in an excess over the cost of insurance and this constitutes the reserve or net value. The

loading has nothing to do with the problem." (Of determining reserve or net value.) (Parenthetical insertions ours.)

The same contentions, as here, were made, upon the testimony of this same actuary, in Fox v. Mutual Benefit Life Ins. Co. (U. S. C. C. A.), 107 Fed. (2d) 715. The court there said that this actuary attempted "to draw a distinction between net value and reserve," but that "any such distinction ▆▆▆▆ is completely untenable and is precluded by the Missouri decisions." [See also discussion in Lindsey v. Prudential Ins. Co., 16 Fed. Supp. 880.] We think such a distinction is likewise contrary to the whole plan of Article 2, Chapter 37, R. S. 1939, regulating life insurance. The basic principles, of this plan for legal reserve life insurance, were enacted in 1869 (Laws 1869, p. 26) and in 1874 (Laws 1874, p. 83). In Section 29 of the 1869 Act providing for valuation of policies by the Superintendent of Insurance (as amended now Sec. 5831, R. S. 1939, Sec. 5720, Mo. Stat. Ann. 4364), it was provided that "he shall, in all cases, calculate values by net premiums." We have come back to that basis as the sole basis of valuation (Laws 1933-34, Ex. Session, p. 75) after allowing the Superintendent "discretion" to "calculate such values by gross premiums receivable, after deducting a margin for expenses (determined by the actual experience of the company) . . . whenever the solvency of a company is in question." [Sec 5720, R. S. 1929.] No doubt depression experience, of which much is shown in our recent decisions, demonstrated that valuation "by net premiums" is the only sound basis. Section 28 of the 1869 Act (now Sec. 5830, R. S. 1939, Sec. 5719, Mo. Stat. Ann. 4364) authorized distribution of profits among policyholders, after reserving first "an amount sufficient to provide for all losses, expenses and liabilities," and second "an amount not less than the aggregate *net value* of all its outstanding policies." and it was further provided for "said value to be computed as directed for the valuation of all policies by the twenty-ninth section of this (1869) Act," now Section 5831. Obviously, the amendment in this latter section (Sec. 29, later Sec. 5720, R. S. 1929), authorizing discretionary calculation of values by gross premiums receivable in cases where solvency was a question, did not in any way affect the provisions of Section 28 (which has remained unchanged), because such distribution by an insolvent company would never have been authorized by it. Thus we see that "net value" was required to be computed from net premiums, in 1869, before there was a nonforfeiture statute.

The Act of 1874 provided for registration of policies and deposits of securities, representing the reserve. The provisions of the first 10 sections of this act are now substantially covered by Sections 5815 to 5824, R. S. 1939, Sections 5704 to 5713, Mo. Stat. Ann., p. 4357-4360. Section 3 of this 1874 Act provided that "the market value of securities deposited shall always be equal to the actual value of the regis-

tered policies and annuity bonds issued by said company. . . . All valuations of policies and annuity bonds made under the provision of this Act shall be computed according to the standard of valuation designated in Section 29'' (of the 1869 Act), which was ''by net premiums'' as above shown. This language ''actual value'' was carried down to and through the 1929 statutes. The amendment in the 1933-34 Extra Session (Laws 1933-34, Ex. Session, p. 61) changed this to ''net value'' and added a definition of ''net value'' to Section 5818, R. S. 1939, as follows: ''The term 'net value' of any such registered policy . . . shall be the total of the various reserve values thereof as defined by Section 5831.'' Since Section 5831 now provides all valuations ''shall be upon the net premium basis,'' the Laws of 1939 again say exactly the same thing as was said by the original Acts of 1869 and 1874. In spite of the amendment authorizing discretionary valuations of companies of doubtful solvency on a gross premium basis, it is plain that in all laws ''net value'' or ''actual value'' meant the same thing as ''reserve'' at all times, because these deposit provisions have at all times meant deposits sufficient to equal values based on net premiums. In short, these terms mean company obligations to living policyholders at any given date. The discretionary gross premium valuation was clearly inserted in order to allow companies of questionable solvency to work out of their difficulties by figuring their solvency on a more favorable basis to them than by net premiums. (By showing future income sufficient to pay obligations which net premiums alone would not pay and therefore requiring less reserves at the time than should be otherwise maintained.) Thus they would be allowed an opportunity to become solvent by saving out of gross premiums in the future to make up impairment in reserves or capital. This background of the 1869 and 1874 Acts clearly demonstrates what was meant by the term ''net value'' as used in the nonforfeiture statute when it was enacted in 1879. [Laws 1879, p. 130.] (It is significant that it said the ''*net value*,'' after deductions, should ''be taken as a *net* single *premium*.'') Therefore, both upon legislative background and subsequent interpretation, we must and do hold that the term ''net value of the policy'' in the nonforfeiture statute is the same as the ''policy reserve'' (same amount if computed by same table) and means value computed by net premiums according to the statutory table. We further hold that defendant's demurrer to the evidence should have been sustained.

The judgment is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.