Sarah G. FAYMAN and Sam J. Stone,
Assignee, Appellants,

v.

FRANKLIN LIFE INSURANCE COMPANY,
Respondent.

No. 50735.

Supreme Court of Missouri,

Division No. 1.

Jan. 11, 1965.

Frank C. Mann, Bob Keeter, Mann, Walter, Powell, Burkart & Weathers, Springfield, for appellants.

Neale, Newman, Bradshaw, Freeman & Neale, Jean Paul Bradshaw, O. J. Taylor, Springfield, Frederick H. Stone, Springfield, Ill., of counsel, for respondent.

HOUSER, Commissioner.

Action in four counts on four ordinary life insurance policies issued by Franklin

Life Insurance Company on the life of Moe Fayman. Plaintiffs are Sarah G. Fayman, beneficiary, and Sam J. Stone, assignee. Loans on each of the policies, made on insured's application pursuant to policy provisions, remained unpaid at the death of the insured. The company tendered $18,013.58, which represented the face amount of the policies, plus certain additions because of interest, less the amount due on the loans. Plaintiffs rejected the tender and filed suit for the face amount of the policies, $35,000, plus interest, 10% penalty for vexatious delay, and attorney's fees. Tried to the court without a jury, judgment was rendered for $18,013.58. Plaintiffs have appealed. The amount in dispute, excluding interest and costs, is $16,656.72.

The case was tried on a stipulation of facts, certain documentary evidence, and oral testimony on two issues on which the parties could not agree. We find the facts to be as follows:

The company issued policies which will be referred to as policies 1, 2, 3 and 4, on the life of Moe Fayman. Policy 1 was issued in 1933, the other three in 1956.

Each policy provided a 31-day grace period for the payment of premiums.

Each policy contained a nonforfeiture provision substantially the same as that appearing in policy 1, the pertinent portions of which follow:

"Non-Forfeiture: This Policy is automatically non-forfeitable as follows: After premiums on this Policy shall have been paid in cash for three full years, if any subsequent premium is not paid before the expiration of the period of grace herein allowed, this Policy will, without action of the Insured or payment of further premiums, continue as non-participating paid-up term insurance for the principal sum insured, but without loan values, as follows:

\*     \*     \*     \*     \*     \*

"2. If there is any indebtedness to the Company hereon, such indebtedness shall be deducted from the net value of the term insurance provided for in paragraph 1 above, computed according to the American Experience Table of Mortality with interest at the rate of three and one-half per cent per annum, and the insurance will be for such term, reckoning from the due date of the unpaid premium, as the excess of such net value over the indebtedness will purchase at the Insured's then attained age at net single premium rates by the mortality table and interest rate aforesaid. In lieu of such term insurance, upon the Insured's written request and legal surrender of this Policy within thirty-one days from the due date of the unpaid premium, the Company will

"(a) Issue a non-participating paid-up life policy payable at the death of the Insured for such amount as the excess above referred to will purchase at the Insured's then attained age at net single premium rates by the mortality table and interest rate aforesaid, or,

"(b) Pay the cash value specified in Column 3 of the table below, less such indebtedness, provided that the payment thereof may be deferred by the Company for a period not exceeding three months from date request is received."

Each policy contained an automatic premium loan provision that any premium remaining unpaid on the last day of grace would be advanced by the company if the cash value of the policy exceeded any indebtedness to the company by an amount sufficient to pay the premium. This provision was revocable at any time with respect to premiums subsequently becoming due by filing with the company at its home office a written request signed by the insured and any assignee of record.

Policies 2, 3 and 4 provided in Section H relating to policy loans that "[t]he whole or any part of any indebtedness may be repaid at any time before default in payment of premium."

Insured had a wife, Sarah, and two married daughters. The sons-in-law were Sam J. Stone and A. B. Kerschenbaum, herein-

after "Mr. S" and "Mr. K." For years insured was in the jewelry business. For several months prior to his death plaintiffs and Mr. K knew that insured was suffering from cancer of the pancreas. Insured entered a hospital February 8, 1962 because of that illness, and died therefrom on March 8, 1962.

Sometime prior to September 29, 1961 Mr. S, an experienced life insurance underwriter, inquired of defendant concerning the amount of reserve available for the payment of premiums under the automatic loan provision of policies 1, 2, 3 and 4, as well as other policies written by the company on insured's life. The company answered that policy 1 had sufficient value to continue in force by means of the automatic premium loan provision, but that policies 2, 3, and 4 did not; that if premiums then due were not mailed within the grace period those three would lapse and "The Extended Term Insurance Provision will go into effect, and the protection will continue to the dates shown in the chart." A memorandum showing these dates was attached. Mr. S continued thereafter to handle the payment of premiums and other affairs of insured relating to these and several other policies of insurance on his life. Premiums coming due were paid by check but on one occasion the automatic premium loan provision was used to pay premiums due on policy 1. On October 19, 1961 insured gave Mr. S a general power of attorney to manage, operate, sell, liquidate or otherwise dispose of his jewelry business. On October 21, 1961 Mr. S asked the company to calculate the net cash value of each policy as of January, 1962 and the additional amount necessary on each policy to permit it to go on extended term insurance for the full face amount for periods of 1, 2 and 3 years. This information was supplied. On February 17, 1962 Mr. S requested the same calculations as of the premium dates coming due in March and April, 1962 and the date to which the net cash value would provide extended term insurance for the face amount of the policies; and how much of

the existing loan would have to be repaid to extend the term for 3, 6, 9 and 12 months from the premium date. The actuarial calculations were made and after a personal conference between Mr. S and a company representative the company wrote Mr. S a letter on March 2, 1962, attaching a chart showing the adjustments necessary on each policy to continue to furnish extended insurance protection to certain dates in June and September. The chart showed that a loan repayment in the total sum of $420.75 would be necessary to accomplish this as to policies 2, 3 and 4; that policy 1 had more than adequate reserve to extend the insurance to September, 1962. The letter stated that "All of the calculations on the attached chart are on the assumption that the contracts will lapse as of the date to which premiums are complete. As you know, each contract contains an Automatic Premium Loan Provision which must be removed and the forms I gave you when you were in the office will have to be returned promptly." On the same day, March 2, 1962, a general power of attorney was executed by insured constituting Mr. K his attorney to act for him with respect to his property, including his life insurance, and Mr. K wrote the company enclosing a power of attorney, but mistakenly sending the company Mr. S's power of attorney relating to the jewelry business (not Mr. K's power of attorney relating to insurance matters), together with signed requests for revocation of the automatic premium loan provision. The letter, which was also signed by Mr. S, as assignee, requested "Said revocation to be effective this date." (The reason Mr. S signed as assignee: on November 14, 1961 insured had assigned the policies to Mr. S to secure a debt of approximately $1490 owed by insured to Mr. S. Out of the proceeds of the policies Mr. S's debt was to be paid, balance to be paid to the beneficiary.) Mr. K's letter of March 2 was received by the company March 5. On March 3 Mr. K, realizing his error, wrote another letter enclosing his own power of attorney. The letter of March 3 was

received in the company's office in due course (date not reflected by record). The company never took action on this request for revocation. (There is no provision in the policy requiring the company to take action thereon.)

Insured had borrowed from the company a total of $17,031 on the four policies. That amount remained unpaid at the time of his death.

The premiums on policy 1 were paid to April 30, 1962; on policy 2 to March 4, 1962; on policy 3 to March 5, 1962 and on policy 4 to April 5, 1962.

As of March 5, 1962:

|  | Policy 1 | Policy 2 | Policy 3 | Policy 4 |
|---|---|---|---|---|
| Net value | 6,244.20 | 4,005.00 | 3,264.38 | 4,325.00 |
| Indebtedness due the company | 5,870.59 | 4,004.28 | 3,078.75 | 4,077.50 |
| Excess of net value over indebtedness | 373.61 | .72 | 185.63 | 247.50 |

———◆———

If the nonforfeiture provisions of the policies were applicable under the facts and circumstances of this case the above excesses of net value over indebtedness to the company would have provided paid-up term insurance as of March 5, 1962 for the face amount of the policies from March 5, 1962 to the following dates: Policy 1, July 13, 1962; Policy 2, March 7, 1962; Policy 3, June 13, 1962; Policy 4, June 13, 1962.

If the excess of net value over indebtedness as to Policy 2 had been greater by the sum of $274.30, such total excess would have been sufficient to provide paid-up term insurance in the face amount of the policy to a date beyond March 8, 1962.

On March 8, 1962 a registered letter was received in the mail room of the company's home office at Springfield, Illinois, delivered by the regular letter carrier, addressed to the company, to the attention of Mr. Evans, Supervisor of General Services Section, relating to policies 1, 2, 3 and 4, signed by A. B. Kerschenbaum, "POWER OF ATTY FOR MOE FAYMAN" and Sam J. Stone, "ASSIGNEE." Dated March 6, 1962, it was postmarked Springfield, Missouri, March 6, 1962. It bore a Springfield, Illinois postmark March 7, 1962. The time of day it was received in the company's mail room is not in the record but in the ordinary course mail reached that room between 9 and 9:30 o'clock a. m. A check for $440.75 was enclosed. The writers of the letter indicated their "desire to put all policies under the extended term option for their respective face amounts." Their explanation for the difference between the $420.75 and the $440.75 was as follows: "Because of the desire to effect these exchanges as of March 5th, instead of March 8th, as was calculated and set up in your letter of March 2nd, we have included in our check ($440.75) an additional $20.00, to allow you to make the desired and necessary adjustments." The letter stated specifically the portion of the $420.75 included for the purpose of extending policies 2, 3 and 4 to specified dates in September, 1962. It recited that according to their interpretation of the company's calculation policy 1 had more than adequate reserve "to extend the insurance to the date desired." The company was requested to use that reserve to extend the insurance "for as long as that reserve allows." Also enclosed were four separate applications for exchange of policies 1, 2, 3 and 4 and the issuance in lieu thereof of four new policies in the same face amounts as the old, to be dated March 5, 1962. The plan of insurance of the new policies was to be "Extended

"Term." Sarah G. Fayman was to be named as direct beneficiary. The wives of Mr. S and Mr. K were to be named as contingent beneficiaries. The applications were signed by Mr. S as assignee, and Mr. K, "Power of Atty for Moe Fayman." In the case of policies 2, 3 and 4 it was requested that the appropriate amount of the enclosed check be applied "to reduce loan before making exchange." Policy 4 was enclosed, with the statement that policies 1, 2 and 3 would be received under separate cover.

The person in charge of the mail room delivered the letter unopened to the policy owners' service exchange department. On the back of the envelope and the letter a time stamp recites "Mar 8 11:49 A.M. '62 Policy Owners Service Exchange." There is no testimony as to when the stamp was affixed with reference to the time the letter was delivered to that department. Moe Fayman, the insured, died at 11 a. m. on March 8, 1962.

The company returned the $440.75 check to Mr. S, rejecting the applications for exchange of policies for the reason, among others, that the applications "are for an exchange to a plan of insurance—extended term—which the Company does not issue. Extended term insurance or paid-up term insurance, as it is referred to in the policies, is the Automatic Nonforfeiture Provision if a premium is not paid before the expiration of the period of grace. Paid-up term insurance can only become effective upon default in premium payments at the end of the grace period." It was pointed out that the policies "do not expressly provide for any change in the plan of insurance. Consequently, any change in a plan of insurance can only be made with the consent of the Company. It is our general practice to require evidence of insurability satisfactory to the Company before permitting a change from a permanent plan of insurance to a term plan of insurance. As previously pointed out, however, the Company does not issue an extended term plan of insurance." While the company did not have a plan of insurance identified or known

as "extended term insurance" for original issuance, it was the intent and purpose of Messrs. S and K, by their letter of March 6, the enclosure of the applications for exchange, and the revocation of the automatic loan provisions of the policies, to put into effect paid-up term insurance as of March 5 for the face amounts of the policies. In the company's letters and charts the terms "paid-up insurance," "extended term insurance" or "extended term," were used synonymously and interchangeably and in their use the parties were talking about the same thing, namely, the "paid-up term insurance" referred to in the nonforfeiture clause.

Whether the beneficiary and assignee are entitled to the face amount of the policies plus interest or only the difference between that figure and the amount due on the policy loans depends upon whether the nonforfeiture provisions became operative and went into effect prior to March 8, the date of insured's death.

Plaintiffs' theory is that the nonforfeiture provision of each policy constituted a continuing offer by the company to the insured, giving the insured an option upon acceptance of the offer to take either extended term insurance, paid-up life insurance, or the cash surrender value of the policies; that the letter of March 6 constituted an election to create a default in the payment of premiums, and did create such a default, and amounted to an acceptance of the company's continuing offer to take extended term insurance in the face amount of each of the policies; and that the acceptance of the offer was effective when posted in the United States mail on March 6, two days before the insured's death.

Plaintiffs' theory may not be sustained. Their contention is based upon the nonforfeiture provisions of the policies and the provisions of the nonforfeiture statutes, §§ 376.630, V.A.M.S. et seq., which are as much a part of these policies as if written therein. Doty v. American Nat. Ins. Co., 350 Mo. 192, 165 S.W.2d 862, 143 A.L.R.

1062. The purpose of the nonforfeiture statutes was to prevent the unfair situation which existed before their enactment in which insurance companies could forfeit and keep all of the net value of a policy when it lapsed, Magers v. Northwestern Mut. Life Ins. Co., 348 Mo. 96, 152 S.W.2d 148, 151; "to prevent the forfeiture of the policy reserve when the policy lapsed for nonpayment," Doty v. American Nat. Ins. Co., ·supra, 165 S.W.2d, 1. c. 867 [6]; "to secure to an insured who has paid premiums for 3 or more years substantially what the excess of his contributions over the cost and expense properly attributable to the carrying of his insurance to the date of lapse will purchase in the way of extended or paid-up insurance," Columbian Nat. Life Ins. Co. v. Griffith, C.C.A. 8 Cir., 73 F.2d 244, 245 [1]; Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474, 481 [7], 129 A.L.R. 1094. Under the nonforfeiture statutes, §§ 376.630, V.A.M.S. et seq., and the judicial decisions construing them, the law jealously guards and protects the rights of policyholders in the excess reserves built up in the early years of level premium life insurance policies. The benefits conferred by these statutes cannot be abrogated, waived, or contracted away, either by agreement in the policy or by agreement made between the parties prior to default.[1] If any advance agreement is made for the disposition of the reserves upon default for which statutory authority cannot be found it is unenforceable and void.[2] The public policy involved overrides the freedom of contract of the parties before default with reference to these benefits and prior to the time the nonforfeiture statutes become effective[3] (although thereafter the holder and the company can make any further agreement they desire[4]). These rules are made for the benefit and protection of policyholders, to insure that at the moment of default their rights in the excess reserves shall be vouchsafed to them. This arm of protection thrown around policyholders, however, gives them no rights to these benefits except in conformance and compliance with the statutes and policy provisions. Plaintiffs, seeking the benefit of the nonforfeiture statutes, must accept the conditions they impose, Sanderson v. Postal Life Ins. Co., C.C.A. 10 Cir., 72 F.2d 894, 897 [4, 5, 6], and are bound by the terms and provisions of the policies relating to nonforfeiture, just as their insured was bound thereby. Couch on Insurance 2d, Vol. 6, §§ 32:161, p. 386 and 32:182. The nonforfeiture statutes plainly reveal that the right to the extended or paid-up insurance or cash benefits they preserve for the legal holder of a policy of life insurance begin at the time when, but for the statutes, the policy would "be forfeited or become void by reason of nonpayment of premiums thereon"; begin *"at the time of default of premium"—"at the date of lapse."* Judicial utterances with respect to the time nonforfeiture benefits take effect confirm that they were written into life insurance policies in contemplation of the situation in which a *lapse of the policy* for nonpayment of premiums has occurred; that a nonforfeiture clause has nothing to do with a "live" policy but "deals wholly with a lapsed policy," prescribing the various automatic and optional forms in which the insured may receive the benefit of

1. State ex rel. and to Use of Heuring v. Allen, 342 Mo. 81, 112 S.W.2d 843, 846; Cleaver v. Central States Life Ins. Co., supra; Bramble v. Kansas City Life Ins. Co., 349 Mo. 318, 160 S.W.2d 746; Gooch v. Metropolitan Life Ins. Co., 333 Mo. 191, 61 S.W.2d 704; Liebing v. Mutual Life Ins. Co., 269 Mo. 509, 191 S.W. 250; State ex rel. Clark v. Becker, 335 Mo. 785, 73 S.W.2d 769; Burridge v. New York Life Ins. Co., 211 Mo. 158, 109 S.W. 560; Cravens v. New York Life Ins. Co., 148 Mo. 583, 50 S.W. 519, 53 L.R.A. 305.

2. State ex rel. and to Use of Heuring v. Allen, supra, 112 S.W.2d, 1. c. 846.

3. Gooch v. Metropolitan Life Ins. Co., supra, 61 S.W.2d, 1. c. 707.

4. Bramble v. Kansas City Life Ins. Co., supra, 160 S.W.2d, 1. c. 749 [3]; State ex rel. Adams v. Allen, 343 Mo. 1191, 1200, 125 S.W.2d 854, 859.

"such value as [it] has as [a] lapsed" policy. Willingham v. Equitable Life Assur. Soc., C.C.A. 5 Cir., 86 F.2d 72, 75 [3]; Magers; Doty; Cleaver; Griffith, supra.

■ We will assume that the action taken by Mr. K on March 2 and 3 effectively revoked the automatic premium loan provisions of the policies as of March 6; that Messrs. S and K had full authority to act for the insured in sending their letter of March 6, and that the date of the posting of the letter of March 6 is to be considered as the effective date the company was notified of the insured's desire to make a change. Even so, the letter of March 6 did not constitute the acceptance of a continuing offer, or the exercise of an option to take extended term insurance, as argued by plaintiffs. The policies were to become nonforfeitable automatically after payment of premiums for three full years if any subsequent premium should not be paid before the expiration of the grace period, but the nonforfeiture provisions for paid-up term insurance do not constitute an option in the sense in which plaintiffs use the term. While the provision for extended insurance equal to the face of the policy has been referred to as an "automatic option," Columbian Nat. Life Ins. Co. v. Griffith, supra, 73 F.2d, 1. c. 245 [2], this means merely that paid-up term insurance will go into effect upon default in payment of premium and expiration of grace period unless insured takes certain prescribed affirmative steps during the grace period so as to avail himself of one or the other of two optional benefits. Nor do the nonforfeiture provisions constitute continuing offers which may be accepted by insured at any time before lapse, whereby a contractual arrangement for the disposition of the policy reserve different from that contained in the nonforfeiture provisions may be entered into prior to default, as plaintiffs contend. Instead of constituting an offer or option the nonforfeiture provisions for paid-up term insurance were contractual rights to which this insured would become entitled upon failure to pay subsequent premiums, expiration of grace periods, and lapse of the policies. When these things happen, i. e., *after the policies shall have lapsed,* the insured without any action on his part automatically would become entitled to temporary extended insurance for the principal sum insured for the time the excess of net value over any indebtedness due the company would buy insurance. The only real options were those provided for in paragraphs 2(a) and (b) of the nonforfeiture provisions: a paid-up policy for life for a reduced amount, or the cash surrender value.

On March 6 the premiums on policies 1 and 4 had been paid to April 30 and April 15, respectively. On March 6 the premiums on policies 2 and 3 were overdue (two and one days, respectively), but they were "live" policies, because well within the 31-day grace period. Thus on March 6 all four policies were in full force and effect, subject to the repayment of loans, none having lapsed by expiration of the grace period after nonpayment of loans. None of the things had occurred on March 6 which under the policy provisions had to occur before the nonforfeiture provisions automatically would become operative so as to provide extended insurance. No "subsequent premium" was left unpaid "before the expiration of the period of grace." None of the policies had lapsed. By the letter of March 6, mailed two days before insured's death, the four policies were sought to be surrendered and, depending upon the construction to be placed upon the letter and its enclosures, insured through his attorney in fact and assignee sought either to continue the existing policies under extended term insurance, or to exchange them for new policies to be issued under an extended term plan. The new extended insurance coverage was intended to commence operation retrospectively as of March 5, and continue thereafter until September, 1962, for the full amount of the policies.

■ Under the policies as written the company, in case of insured's death during the grace period following a default in the

payment of a subsequent premium, had a legal right to deduct from the face value of the policies the amounts loaned to the insured. Neither the insured nor his attorney in fact or assignee could take that right away from the company by the unilateral act by which they attempted to accelerate the effective date of the extended insurance coverage. At no time prior to the date of lapse could *the company* have avoided the terms and conditions of the policies as written, Bramble v. Kansas City Life Ins. Co., 349 Mo. 318, 160 S.W.2d 746, 750 [7], and in like manner the insured, his nominee, assignee, and beneficiary, cannot avoid the terms and conditions of the policies which required a lapse of the policies before they could enjoy the full benefits of the policies without deduction for the policy loans. The nonforfeiture provisions upon which plaintiffs are obliged to rely preclude the right to extended insurance under any other circumstances. Fidelity Mut. Life Ins. Co. v. Heltsley, 254 Ky. 453, 71 S.W.2d 1017, 1. c. 1020. To hold for plaintiffs we would be obliged to write an additional provision into the contract giving insured an election to surrender the policies and invoke the provisions for paid-up term insurance before the expiration of the grace periods. We are not at liberty to so rewrite the policies. Unilateral action on the part of the insured by which he could surrender the policies and invoke the extended insurance benefits, prior to lapse of the policies, was not authorized or contemplated by any provision of the policies. Under the policies as written, which were in full force and effect and none of which had lapsed, insured, his attorney-in-fact and assignee, had no right in advance to elect to create a default *in praesenti,* or hasten the time within which the policies would normally lapse by nonaction and passage of time, or otherwise accelerate the time when the automatic provision for paid-up term insurance would become operative, and there is *no statutory authority* for the method by which it was attempted to dispose of the reserves on an anticipated default.

The letter of March 6 was ineffective to accomplish its purpose.

Plaintiffs cite Lovell v. St. Louis Mut. Life Ins. Co., 111 U.S. 264, 4 S.Ct. 390, 28 L.Ed. 423; Lipman v. Equitable Life Assur. Soc. of U. S., C.C.A. 4 Cir., 58 F.2d 15; Manhattan Life Ins. Co. v. Allison, 100 Colo. 1, 64 P.2d 1265, and Fennell v. John Hancock Mut. Life Ins. Co., 256 Ala. 15, 53 So.2d 556, in support of the right of this insured at his option to create a default before a premium due date in this situation. In Lovell insured asked for the issuance of a paid-up policy in a reduced amount, a request against his own interest since he was entitled to insurance for the full amount until default; furthermore, neither agent nor company made any objection to surrender in advance. In Lipman the nonforfeiture provision made no reference to the grace period and the different policy provision, describing insured's right as an "*option,*" was such that it could be construed not to make insured's right to exercise the option await the lapse of the policy. In Manhattan the election to take the cash surrender value was made during the policy period *to take effect upon default* in the payment of premium (not retrospectively) and the acts necessary to effectuate cancellation took place *after* default. In Fennell insured's election to surrender the policy for its cash value and the actual surrender of the policy was accepted by the company, which issued its check in payment of the cash value and sent the check to its agent for delivery to insured, before there was any default in paying the premium on the due date. Without elaborating on other distinguishing features of these cases, we find them not persuasive.

■ This disposes of plaintiffs' contentions if the letter of March 6 be construed as an attempt to continue the existing policies under extended term insurance. Plaintiffs have no better rights if the letter be construed as an effort to exchange the old policies for new ones. The applications for exchange requested the issuance of new policies on a different plan of insurance—

extended term instead of ordinary life—which was not issued by the company as an independent plan of insurance. Predating of the policies as of March 5 was requested. A different beneficiary arrangement (adding the daughters as contingent beneficiaries whereas they were so designated in only one of the four existing policies) was specified. No evidence of insurability was submitted (insured was in extremis and died two days later), although it was company practice to require such evidence before exchanges were made. Only the president or secretary had power on behalf of the company to modify the contract, and there was no provision authorizing an exchange of policies at the time and in the manner sought to be accomplished by the letter of March 6. The repayment of a portion of the loan on policy 2 on March 6 was tardy under Section H, which allowed repayment of policy loans "at any time before default in payment of premium." Accordingly, the letter of March 6 and its enclosures, not being an action taken under any provision of the policies, would have to be considered as an offer on the part of insured for a special contract. Such an offer would require acceptance by the company before the policies requested to be issued in exchange would become effective. The offer was not accepted and was revoked by insured's death on March 8. Landy v. New York Life Ins. Co., 170 Misc. 942, 11 N.Y.S.2d 622; Murphree v. National Life & Accident Ins. Co., 168 Miss. 667, 150 So. 534, 151 So. 748; Gram v. Mutual Life Ins. Co., 300 N.Y. 375, 91 N.E.2d 307; Fidelity Mut. Life Ins. Co. v. Heltsley, supra.

Appellants argue that the 31-day grace period referred to in Section B and in the nonforfeiture provision of each of the policies "is a provision solely for the benefit of the insured" and that it is capable of being waived, and was waived by him "in connection with his option to elect to take extended term insurance." The grace period provided for in Section B, allowing the late payment of premiums, is not involved for there is no question in this case respecting the late payment of premiums. The grace period referred to in the nonforfeiture provision is not "solely for the benefit of the insured." Under certain circumstances the grace period provided for in the nonforfeiture provision is for the benefit of the company. Under the circumstances of this case the death of insured during the grace period, i. e. before the policy lapsed, would have been considerably more to the advantage of the company than his death after the expiration of the grace period. If the death occurred before lapse the company's liability was approximately $18,000, because in such case the indebtedness would first be subtracted from the face amount of the policies. But if the death occurred after lapse (in which case the indebtedness would be absorbed and paid out of the net value of the policies) the company's liability would have been the face amount of the policies, $35,000, plus certain additions for interest, under the provisions for extended insurance. The occurrence of a lapse under the terms and conditions of the policy as written made the difference. Absent a lapse the nonforfeiture provision would not be activated. The company had a right to insist upon the expiration of the grace period provided for in the nonforfeiture provision, and plaintiffs could not waive the company's right thereunder.

When the insured died on March 8 the nonforfeiture provisions of the policy had not yet become operative. The beneficiary and assignee of insured were entitled only to the difference between the face amounts of the policies plus additions for interest and the amounts of the policy loans. The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HYDE, P. J., and HOLMAN and HENLEY, JJ., concur.

DALTON, J., absent.